ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7012

# In the United States Court of Appeals for the District of Columbia Circuit

**DAVID W. NOBLE, JR.**

*Plaintiff-Appellant,*

**v.**

**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO, ALAMO BRANCH 421, AND BRANCH 9 NALC,**

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

_____

**REPLY BRIEF FOR APPELLANT**

_____

Daniel F. Olejko
BRAGALONE OLEJKO SAAD PC
901 Main St., Ste. 3800
Dallas, Texas 75202
214-785-6670
dolejko@bosfirm.com

*Counsel for Plaintiff-Appellant
David W. Noble, Jr.*

Dated: July 5, 2023

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Plaintiff-Appellant David W. Noble, Jr. submits the following information in accordance with Circuit Rule 28(a)(1):

### Parties and Amici

The parties to this case are Plaintiff-Appellant David W. Noble, Jr. and Defendants-Appellees National Association of Letter Carriers, AFL-CIO ("NALC"), NALC Alamo Branch 421, and NALC Branch 9. At present, there are no amici curiae or intervenors in this case.

### Rulings Under Review

Appellant seeks review of the order of dismissal and memorandum opinion of the U.S. District Court for the District of Columbia filed on December 13, 2022, in *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO, et al.*, No. 1:22-cv-01613-DLF, 2022 WL 17613057 (D.D.C. Dec. 13, 2022). JA000296–309.

### Related Cases

The case on review has not been previously before this Court or any other court. To the best of counsel's knowledge, no other related cases are currently pending in this Court or in any other federal court of appeals, nor in any other court in the District of Columbia.

Dated: July 5, 2023

                            */s/ Daniel F. Olejko*

                            Daniel F. Olejko

                            D.C. Circuit Bar No. 64141

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES,  RULINGS, AND RELATED CASES ............................................................................................ i

TABLE OF CONTENTS.................................................................. iii

GLOSSARY .................................................................................. vii

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ....................................................................................2

A.  The District Court Erred by Applying an Overly Narrow Interpretation of LMRDA § 401(c). ..........................................2

1.  Adopting Noble's Interpretation of LMRDA § 401(c) Would Not Violate NALC's First Amendment Rights. .........................................2

2.  None of the Cases Cited by NALC Have Rejected Noble's Interpretation of LMRDA § 401(c). ...........................................7

3.  The Department of Labor's Guidance Supports, Rather than Undermines, Noble's Interpretation of LMRDA § 401(c). .................9

4.  LMRDA § 401(c) Applies to All Reasonable Methods of Distributing Campaign Literature. ....................................................13

5.  The District Court's Narrow Interpretation Is Not Supported by the Policies Underlying LMRDA.....................................................16

B.  The District Court Erred in Determining that Noble's Request Was Unreasonable as a Matter of Law.................................................18

6.  The District Court Erroneously Ignored Noble's Status as a Pro Se Litigant.........................................................................22

CONCLUSION.............................................................................26

CERTIFICATE OF COMPLIANCE.............................................28

CERTIFICATE OF SERVICE.....................................................29

# TABLE OF AUTHORITIES

**Cases**

*Camarata v. International Brotherhood. of Teamsters, Chauffeurs, Warehousemen & Helpers of America,*
478 F. Supp. 321 (D.D.C. 1979) ..............................................6, 7, 8, 10

*Chamber of Commerce of U.S. v. NLRB,*
118 F. Supp. 3d 171 (D.D.C. 2015) ......................................................3

*Dimondstein v. American Postal Workers Union,*
964 F. Supp. 2d 37 (D.D.C. 2013) ..............................10, 11, 12, 13, 18

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS,*
926 F.3d 819 (D.C. Cir. 2019) ..........................................................10

*Hodgson v. United Mine Workers of America,*
344 F. Supp. 17 (D.D.C. 1972) .......................................................7, 19

*International Organization of Masters, Mates & Pilots v. Brown,*
498 U.S. 466 (1991) ...................................................12, 17, 18, 20, 22

*Knox Cty. Local, Nat'l Rural Letter Carriers' Assoc. v. Nat'l Rural Letter Carriers' Ass'n,*
720 F.2d 936, 940 (6th Cir. 1984) ......................................5, 7, 17, 18

*McBride v. Merrell Dow & Pharms., Inc.,*
613 F. Supp. 1349 (D.D.C. 1985) .......................................................16

*Miami Herald Pub. Co. v. Tornillo,*
418 U.S. 241 (1974) .............................................................................5

*Moore v. Agency for Int'l Dev.,*
994 F.2d 874 (D.C. Cir. 1993) ......................................................22, 25

*Nat'l Ass'n of Mfrs. v. Perez*,
    103 F. Supp. 3d 7 (D.D.C. 2015) ........................................3–4

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ....................................................16

*Pacific Gas & Elec. Co. v. Public Utilities Commission of California*,
    475 U.S. 1 (1986) .......................................................5

*Passaic Daily Newspaper v. NLRB*,
    736 F.2d 1543 (D.C. Cir. 1984) .........................................5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ...................................................15

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982) ...................................................26

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc. (FAIR)*,
    547 U.S. 47 (2006) ................................................3, 6, 7

*Shimman v. Miller*,
    995 F.2d 651 (6th Cir. 1993) ...........................................5

*Skidmore v. Swift Co.*,
    323 U.S. 134 (1944) ...................................................10

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    24 F.4th 686 (D.C. Cir. 2022) .........................................26

*Yablonski v. United Mine Workers of America*,
    305 F. Supp. 868 (D.D.C. 1969) .............................6, 7, 8, 20

*Yablonski v. United Mine Workers of Am.*,
    305 F. Supp. 876 (D.D.C. 1969) ......................................8–9

**Statues, Regulations, and Rules**

LMRDA § 101(a), 29 U.S.C. § 411(a)......................................................18

LMRDA § 401(c), 29 U.S.C. § 481(c) ..................1–3, 6–13, 16–18, 21–25

3 DCMR 3018, Identification of Campaign Literature (2015)...............15

# **GLOSSARY**

| | |
|---|---|
| LMRDA | Labor Management Reporting and Disclosure Act (Landrum Griffin Act), 29 U.S.C. § 401, *et seq.* |
| NALC | Defendant-Appellee National Association of Letter Carriers, AFL-CIO |
| Branch 421 | Defendant-Appellee Alamo Branch 421 |
| Branch 9 | Defendant-Appellee Branch 9 NALC |
| Local Branches | Defendant-Appellees Alamo Branch 421 and Branch 9 NALC |
| Noble | Plaintiff-Appellant David W. Noble, Jr. |
| USPS | United States Postal Service |
| DOL | Department of Labor |
| OMLS | Office of Labor–Management Standards |

## SUMMARY OF ARGUMENT

Contrary to NALC's argument, Noble's interpretation of LMRDA § 401(c) does not run counter to the text and purpose of the statute, conflict with any case law involving the pertinent portion of the statute, or impede NALC's First Amendment rights. In fact, Noble's interpretation of the statute is consistent with Supreme Court precedent, the only district court decision cited by the parties involving the pertinent portion of the statute, and DOL's guidance on that portion of the statute. The statute employs very broad language, serves a special purpose, and deserves a broad interpretation that plainly covers a candidate's reasonable request to place a campaign advertisement in a union magazine.

There was nothing unreasonable about Noble's request in this case. NALC did not (and does not) demonstrate that compliance with Noble's request would have caused it any administrative or financial hardship or that it discriminated against any other candidate. NALC's only basis for opposing Noble's request was an arbitrary union rule limiting the placement of campaign advertisements to a single issue every four years. But Noble's request was not *per se* unreasonable simply because it

violated NALC's rule, even if that rule is reasonable. Because NALC allows the placement of campaign advertisements in the *Postal Record* in some issues, it was reasonable for Noble to request the placement of campaign advertisements (at his own expense) in others.

For these reasons, and others detailed below, the Court should reverse the district court's dismissal of Noble's complaint.

## ARGUMENT

### A. The District Court Erred by Applying an Overly Narrow Interpretation of LMRDA § 401(c).

#### 1. Adopting Noble's Interpretation of LMRDA § 401(c) Would Not Violate NALC's First Amendment Rights.

The district court did not base its decision on any possible violation of NALC's First Amendment right against compelled speech. *See* JA00305–309. Instead, the district court ruled only that Noble's request did not fall within the plain language of LMRDA § 401(c) and that, even if it did, his request was not reasonable. *See id.* Notwithstanding, NALC seeks affirmance of the district court's dismissal of the complaint on the alternative ground that, if adopted, Noble's interpretation of LMRDA § 401(c) would violate NALC's First Amendment right against compelled speech. NALC's First Amendment concerns are unfounded.

NALC argues only that the First Amendment protects its right

2

against forced *publication* of Noble's campaign literature. Resp. Br. at 7–9. It does not dispute that LMRDA § 401(c) is constitutional when applied to other possible methods of distributing Noble's campaign literature. For example, NALC seemingly agrees that LMRDA § 401(c) can properly require NALC to distribute Noble's campaign literature "by mail" or physical handouts without running afoul with the First Amendment. Yet NALC critically fails to explain *why* there is any difference.

Cases notably distinguish between compelled speech that *interferes* with a speaker's ability to communicate its own message and compelled speech that does not. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc. (FAIR)*, 547 U.S. 47, 63–64 (2006) (distinguishing prior cases where "the complaining speaker's own message was affected by the speech it was forced to accommodate" and "interfered with the [speaker's] ability to communicate its own message"). Laws that merely require a person to "host [] speech," but do not dictate "what [the speaker] may or may not say" about it, do not run afoul with the First Amendment. *See, e.g.*, *Chamber of Commerce of U.S. v. NLRB*, 118 F. Supp. 3d 171, 194 (D.D.C. 2015) (rejecting argument that a posting requirement was unconstitutional); *Nat'l Ass'n of Mfrs. v. Perez*, 103 F.

3

Supp. 3d 7, 17–19 (D.D.C. 2015) (same).

Here, there is no indication from the factual allegations of Noble's complaint that NALC's inclusion of Noble's campaign literature in the *Postal Record* would affect or otherwise interfere with NALC's ability to communicate its own messaging. On the contrary, Noble's complaint alleges that "[NALC] and its incumbent officers use the magazine and branch publications to communicate with the membership," "prominently features the activities of [NALC]'s incumbent officers, against whom Clean Sweep are running in the election," that the *Postal Record* permits similar advertisements in certain issues, and that NALC members are allowed to "place ads requesting mutual transfers" "[i]n every issue of the *Postal Record*." *See* JA000023–25.

Even if it were permissible to consider extrinsic evidence at this stage (it is not),[1] there is no evidence indicating that the *Postal Record* is akin to a commercial newspaper, which employs editors that make critical decisions about what material goes into the newspaper, the size

---

[1] *See, e.g.*, *Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) (holding that the district court "erred by relying on two documents outside the complaint as dispositive evidence of the nature of [plaintiff's] accommodation request").

and content of the paper, and the treatment of public issues and officials. *See, e.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (invalidating a law requiring commercial newspapers to print replies to press criticism of a candidate for nomination or election); *Passaic Daily Newspaper v. NLRB*, 736 F.2d 1543, 1558 (D.C. Cir. 1984) (applying *Tornillo* to a commercial newspaper).

As a union publication, the *Postal Record* is wholly different from a commercial newspaper because it has made itself an open forum for NALC members,[2] and it is owned in equal shares by the union membership. *See Shimman v. Miller*, 995 F.2d 651, 654–56 (6th Cir. 1993); *Knox Cty. Local, Nat'l Rural Letter Carriers' Assoc. v. Nat'l Rural Letter Carriers' Ass'n*, 720 F.2d 936, 940 (6th Cir. 1984). For these reasons, the *Postal Record* is also unlike the corporate newsletter at issue in *Pacific Gas & Elec. Co. v. Public Utilities Commission of California*, 475 U.S. 1, 12 (1986) (invalidating a law that required a corporation to

---

[2] While NALC disputes that the *Postal Record* is an "open forum," it does not dispute that NALC opens the *Postal Record* for campaign advertisements in certain issues and that members can place transfer ads in every issue. *See* Resp. Br. at 20. Further, Noble has alleged that the incumbents use the *Postal Record* to promote themselves in full-page columns in every issue and by running articles that promote themselves. *See* JA000023–24; JA000034–35; JA000068.

include a message of a third-party organization in an envelope associated with its newsletter).

In addition, nothing in LMRDA § 401(c) restricts what NALC may say about Noble's campaign literature or prohibits other members, including incumbents, from responding. *See FAIR*, 547 U.S. at 64. Further, nothing suggests that the union membership would confuse Noble's campaign literature with NALC-sponsored speech in the *Postal Record*. *See id.* at 65. The substance of Noble's campaign literature makes clear that it is *not* sponsored by NALC (it is clearly *anti*-incumbent), and the literature is explicitly designated as a message from "David Noble." JA000013; JA000055–56. There is also no concern of undue cost to NALC, as Noble agreed to pay NALC the cost of running a full-page advertisement in the *Postal Record* ($2,750). JA000024–25.

Neither *Camarata v. International Brotherhood. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 478 F. Supp. 321, 331 (D.D.C. 1979), nor *Yablonski v. United Mine Workers of America*, 305 F. Supp. 868, 875 (D.D.C. 1969), demonstrates, as a matter of law, that the placement of Noble's campaign literature in the *Postal Record* would violate NALC's First Amendment right against compelled speech. Both

6

of these non-binding, district court decisions pre-date the Supreme

Court's decision in *FAIR* and the Sixth Circuit's decision in *Knox*,

involved different facts, different unions, and different union

publications, and did not analyze whether including the candidates'

literature in those publications would interfere with the unions' ability

to communicate their own messaging.

They also conflict with outcome of *Hodgson v. United Mine Workers

of America*, 344 F. Supp. 17, 23, 36 (D.D.C. 1972),[3] which ordered a union

to make available "equal space for the presentation of news concerning,

and the political views of bona fide candidates" because the union used

its journal as a campaign instrument for incumbents.

### 2. None of the Cases Cited by NALC Have Rejected Noble's Interpretation of LMRDA § 401(c).

NALC asserts that Noble's interpretation of LMRDA § 401(c) was

rejected by *Yablonski* and *Camarata*. Resp. Br. at 10. Neither case is

binding on this Court. Moreover, neither case analyzed the statutory

provision at issue. Rather, both cases involved the "similar distribution"

---

[3] NALC attempts to distinguish *Hodgson* on the ground that it involved a violation of LMRDA § 401(c)'s "similar distribution" provision (Resp. Br. at 11–12), but, as discussed below, so did *Camarata* and *Yablonski*.

section of LMRDA § 401(c). *See Camarata*, 478 F. Supp. at 331 ("Defendants have not been requested by plaintiffs to distribute by mail or otherwise at plaintiffs' expense campaign literature in aid of plaintiffs' candidacies to all members in good standing."); *Yablonski*, 305 F. Supp. at 873 ("This matter is now before this Court upon plaintiff's motion for a preliminary injunction directing that the defendants … provide equal space and treatment for plaintiff Yablonski in future issues of the Journal until the election takes place. …").

Indeed, it was "the nationwide mailing *at union expense of plaintiffs' campaign literature* and the inclusion of such literature on the basis of equal space and prominence in future issues of the [union's publication]," that the court rejected in *Camarata. See id.* (emphasis added). In *Yablonski*, the court made clear that LMRDA § 401(c) required "fair and comparable treatment" of the candidate, including the "devot[ion] [of] equal space in the Journal to a presentation of a nondiscriminatory basis of news concerning, and the views of, the two candidates, even if the material to be printed were prepared by the candidates themselves."[4] *Yablonski v. United Mine Workers of Am.*, 305

---

[4] Contrary to NALC's suggestion, the *Yablonski* court did not give the

8

F. Supp. 876, 877 (D.D.C. 1969).

None of the cases cited by NALC have rejected Noble's interpretation LMRDA § 401(c)'s requirement that unions "comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization." 29 U.S.C. § 481(c).

### 3. The Department of Labor's Guidance Supports, Rather than Undermines, Noble's Interpretation of LMRDA § 401(c).

NALC contends that the DOL "has already rejected the claim that Noble makes here" when it found no violation associated with NALC's delay in placing advertisements in the *Postal Record* before the 2018 election. Resp. Br. at 11. But DOL considered only whether NALC's actions in the 2018 election violated LMRDA § 401(c)'s prohibition against "disparate candidate treatment" and the "similar distribution" requirement of 29 C.F.R. § 452.67. JA000053. DOL found no violation because NALC treated all candidates equally in the 2018 election. *See id.*

_____

union the option of publishing only some candidates' views, but not others. *See* Resp. Br. at 10 n.1. It adopted an all or nothing approach.

Like the courts in *Yablonski* and *Camarata*, DOL did not consider whether NALC had failed to comply with a reasonable request of Noble to distribute by mail or otherwise at Noble's expense campaign literature under LMRDA § 401(c).[5] *See id.* Even if DOL's denial of Noble's complaint could be construed as adopting the district court's narrow interpretation of LMRDA § 401(c), DOL provided no reasoning that would justify the application of deference under *Skidmore v. Swift Co.*, 323 U.S. 134, 139–40 (1944). *See Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS*, 926 F.3d 819, 823 (D.C. Cir. 2019) (declining to provide *Skidmore* deference to "a single unreasoned sentence" in an agency's ruling).

However, as discussed in *Dimondstein v. American Postal Workers Union*, 964 F. Supp. 2d 37, 42–43 (D.D.C. 2013), a case cited by both

---

[5] Notably, DOL did not reject Noble's request on the basis that it sought placement of a campaign advertisement in the *Postal Record*, despite the fact that "similar distribution" portion of the statute uses similar language as the "reasonable request[]" portion: "whenever such labor organizations or its officers authorize the *distribution by mail or otherwise* to members of *campaign literature* on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution." 29 U.S.C. § 481(c) (emphasis added).

parties (*see* Op. Br. at 25–26; Resp. Br. at 11), DOL has offered guidance on the meaning of "distribute by mail or otherwise" in the "reasonable request[]" portion of LMRDA § 401(c). In *Dimondstein*, the district court highlighted a Frequently Asked Questions portion of the DOL Office of Labor–Management Standards' website, which provides the following response to the question "Can a union be required to distribute a candidate's campaign literature to members via e-mail, as opposed to using their postal address?":

> Other than by mail, there is no prescribed manner in which unions must distribute campaign literature. Likewise, unions are not required to provide candidates access to all methods of distribution that may be available to the union. Generally, if the candidate's request for an alternative method of distributing campaign literature is a reasonable one, the union is required to make the distribution. Accordingly, OLMS advises unions to comply with a candidate's reasonable request to distribute campaign literature to the membership through email if the union uses e-mail to disseminate information to its members.

964 F. Supp. 2d at 43.

While the website states that "unions are not required to provide candidates access to all methods of distribution that may be available to the union," it makes clear that the pertinent inquiry under LMRDA § 401(c) is whether the request is *reasonable*: "if the candidate's request

for an alternative method of distributing campaign literature is a *reasonable* one, the union is *required* to make the distribution." *See id.* (emphasis in original). Thus, consistent with the district court's ruling in *Dimondstein*, while "there is no *per se* rule requiring unions to distribute via [an alternative method of distributing campaign literature], a union must still abide by reasonable candidate requests to use alternative forms of distribution … if the union uses these alternative forms to disseminate information to its members." *Id.*

The DOL guidance referenced in (and adopted by) *Dimondstein* should carry particular force because it is consistent with the Supreme Court's decision in *International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 475–76 (1991), which held that LMRDA § 401(c) deserves a "broad interpretation" in light of its "basic purpose" and structure that focuses on the reasonableness of a candidate's request, as opposed to whether that request complies with union rules. *See* Op. Br. at 27–28. Because NALC utilizes the *Postal Record* to disseminate information to its members, including campaign advertisements in some issues, the district court should have found that Noble's request fell within the scope of LMRDA § 401(c).

12

### 4. LMRDA § 401(c) Applies to All *Reasonable* Methods of Distributing Campaign Literature.

Consistent with the holding of *Brown*, the district court's ruling in *Dimondstein*, and DOL's guidance, LMRDA § 401(c) should be broadly interpreted to encompass all *reasonable* methods of distributing campaign literature, including Noble's request for NALC to place his campaign advertisement in the *Postal Record*.

While NALC emphasizes that LMRDA § 401(c) does not contain an express "publication" requirement, Congress was not required to anticipate every possible method of distributing campaign literature when drafting the statute. Instead, Congress chose broad language in drafting LMRDA § 401(c), requiring unions to comply with "all reasonable requests … distribute by mail *or otherwise* … campaign literature." 29 U.S.C. § 481(c) (emphasis added). In doing so, Congress necessarily included *any* method of distributing campaign literature, so long as it is reasonable. Indeed, Congress could have, but chose not to, limit the expansive phrase "or otherwise" in the statute.

Contrary to NALC's suggestion, there is no meaningful distinction between "publication" in the sense of placing a campaign advertisement in a magazine and distributing that campaign literature via the mail.

13

According to Merriam-Webster, the verb "publish" means (1) "to make generally known" or "to make a public announcement of" or (2) "to disseminate to the public," "to produce or release for distribution," or "to issue the work of (an author)."[6] These definitions make clear that publication can be a means of distribution. None of the dictionary definitions cited by NALC require the district court's narrow interpretation of distribution that excludes placement of a campaign advertisement in a union magazine.

Whether or not the phrase "campaign literature" is broad enough to include compilations like the *Postal Record* (it is), the phrase is certainly broad enough to include a campaign advertisement like the one proposed by Noble for placement in the Local Branch publications or the other "Clean Sweep 2022" advertisements. *See* JA000013; JA000055–56. The fact that Noble's campaign advertisements had not been physically reduced to a paper printout is irrelevant, as even NALC now concedes. *See* Resp. Br. at 15 (acknowledging that the statute "has now been recognized to encompass distribution by email"), 16 ("Noble next argues that campaign literature need not be on paper, but can be electronic. That

---

[6] https://www.merriam-webster.com/dictionary/publish.

14

is true ….") (citation omitted). Noble's proposed campaign advertisements qualify as "campaign literature" under any reasonable construction of the phrase.[7] *See* Op. Br. at 24–25.

Importantly, Noble did not request that NALC draft, author, or otherwise compose campaign literature for him in the *Postal Record*. Noble requested that NALC allow Noble to "place" his own, pre-prepared advertisements in the *Postal Record* (just as it allows for the pre-election issue). *See* JA000024 ("Plaintiff sent the NALC a request to *place* ads containing *his campaign literature* in the *Postal Record*, beginning with the February 2022 issue.") (emphasis added). Thus, Noble's request effectively put NALC in a position that is closer to a distributor, rather than a newspaper publisher that might make editorial judgments about where to place a particular ad based upon its content. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 386 (1973).

---

[7] Noble's reference to the District of Columbia's municipal regulations supports his argument that the plain and ordinary meaning of "campaign literature" is broad enough to include political advertisements. *See* Op. Br. at 26 & n. 5. The fact that the regulation currently defines "political advertising" rather than "campaign literature" is irrelevant. Resp. Br. at 17. The regulation is titled "Identification of Campaign Literature," and a prior version of the regulation (with the same title) did not utilize the phrase "political advertising." *See* 3 DCMR 3018.1 (2015).

In any event, as NALC points out, DOL regulations "do not even allow a union to insist on reading a candidate's literature before distributing it." Resp. Br. at 15. This limitation effectively insulates NALC from any possible defamation liability, regardless of whether NALC is considered a distributor or publisher. If a union cannot read a candidate's literature before distributing it, it would be nearly impossible to show that the union acted with "actual malice" or that it had reason to know of any false statements therein. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (holding that a newspaper cannot be held liable for defamation in the absence of actual malice); *McBride v. Merrell Dow & Pharms., Inc.*, 613 F. Supp. 1349, 1356–57 (D.D.C. 1985) (stating that the law is intended "to prevent the imposition of liability on an individual [disseminating defamatory material] where he had no reason to know of any false statements"), *aff'd in part, rev'd in part on other grounds*, 800 F.2d 1208 (D.C. Cir. 1986).

### 5. The District Court's Narrow Interpretation Is Not Supported by the Policies Underlying LMRDA.

NALC argues that adopting Noble's interpretation of LMRDA § 401(c) "would undermine the 'long-standing policy of avoiding judicial interference in a union's self-governance and internal affairs.'" Resp. Br.

16

at 18. While that principle may have some relevance in connection with other provisions of the LMRDA, it does not apply to LMRDA § 401(c). As the Supreme Court explained in *Brown*, a candidate's rights under LMRDA § 401(c) are "unqualified" and those rights are *not* subject to a union's "reasonable rules." 498 U.S. at 475. Further, LMRDA § 401(c) is part of Title IV, which unlike other parts of LMRDA serves a "special purpose … to ensure free and democratic union elections." *Id.* at 476.

Given incumbents' "inherent advantage over potential rank and file challengers," including their control of the union newspaper, it is imperative that LMRDA § 401(c) be interpreted broadly so that candidates like Noble have a fair opportunity to share their views with the union membership via all reasonable distribution methods utilized by the union incumbents. *See id.*; *see also Knox*, 720 F.2d at 940–41 ("[W]e cannot agree with the NRLCA's contention that because Knox County Local members had other effective avenues for expressing their views, they were properly denied access to the publication. … [T]he NRLCA's magazine is the only economically feasible channel of communication capable of reaching the 64,000 members of the union community. … [T]he cost of a bulk mailing would have been impracticable. By refusing to

17

allow those members access to its union-wide publication, the NRLCA foreclosed the only reasonable avenue for the effective communication of opposition to the new government.").[8]

## B. The District Court Erred in Determining that Noble's Request Was Unreasonable as a Matter of Law.

The primary consideration in resolving Noble's request under LMRDA § 401(c) should have been whether that request was reasonable. Based on *Dimondstein* and DOL's guidance, this Court should conclude that Noble's request was reasonable because NALC clearly utilizes the *Postal Record* to disseminate information to its members, and since NALC allows candidates to place campaign advertisements in the *Postal Record* in certain issues. 964 F. Supp. 2d at 43. This is true even if Noble's request conflicted with NALC's alleged longstanding policy of permitting campaign advertisements in only one issue every four years. *See Brown*, 498 U.S. at 478 (holding that a request is not "*per se* unreasonable simply because it conflicts with a union rule").

NALC does not dispute that, in resolving the reasonableness

---

[8] While *Knox* involved the application of LMRDA § 101(a)(1) rather than § 401(c), its reasoning is nevertheless instructive, especially in light of the "special purpose" underlying Title IV. *Brown*, 498 U.S. at 475.

inquiry, the district court did not weigh the factors outlined in *Brown*, including whether the request "caused administrative or financial hardship to the Union" or whether "it discriminated against any other candidate." *Compare* Op. Br. at 35, *with* Resp. Br. at 22–24. Nor does NALC show where in the record it made any arguments based on these factors (because it cannot). Indeed, the *only* justification made by NALC for refusing Noble's request was its alleged "longstanding [] policy." JA000011. Now, NALC raises a number of new arguments about reasonableness that were never advanced below. *See* Resp. Br. at 22–24. Each of these arguments should be rejected.

First, NALC argues that Noble's request was unreasonable because "it sought to infringe NALC's 'absolute discretion' to determine when to print candidate campaign advertisements." *Id.* at 22. But, as discussed, the *Postal Record* is unlike a commercial newspaper or even a corporate newsletter. It does *not* have "absolute discretion" to determine what to print and when to print it. LMRDA § 401 prohibits unions from using a journal as campaign literature for incumbents without providing equal space for other candidates. *See, e.g.*, *Hodgson*, 344 F. Supp. at 36 ("Both on the grounds of comity and the evidence adduced in the trial, the court

19

finds that the Journal was used as a campaign tool during a critical period of the election campaign, thus constituting a violation of Section 401(g) of the Act."); *Yablonski*, 305 F. Supp. at 871 ("A line must be drawn between the use of the Journal to report the activities of defendant Boyle as President, which is permissible, and the use of the Journal, in such a way in reporting such activities, as to promote the candidacy of said defendant.").

In addition, NALC does not have absolute discretion to determine *when* it should distribute campaign literature. It is well-settled under *Brown* that NALC may not establish rules, however reasonable, that restrict union's obligation to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy. *See* 498 U.S. at 475 ("[T]he language of the statute plainly requires unions to comply with 'all reasonable requests,' and just as plainly does *not* require union members to comply with 'all reasonable rules' when making such requests. … Having dispensed with the Union's argument that a request is *per se* unreasonable simply because it conflicts with a union rule, we need only note again that in this case the Union does not advance any other reason

for suggesting that respondent's request was unreasonable.") (emphasis in original).

Second, NALC argues that Noble's request was unreasonable because it could open the floodgates to numerous other requests by candidates. Resp. Br. at 22. But NALC's concern is entirely speculative and not supported by the facts. On their face, Noble's allegations do not demonstrate, let alone suggest, that any other candidate for the 2022 election sought to place similar campaign advertisements in the *Postal Record*.

Third and similarly, NALC argues that the *Postal Record* could be turned into campaign literature if Noble's request is granted. Resp. Br. at 23. But granting Noble's request would not allow every union member to publish his or her views on union governance in the *Postal Record*. LMRDA § 401(c) applies to only *bone fide* candidates for office, and, in the 20 years preceding Noble's first run for office, no one even bothered to challenge the incumbent president. JA000068.

In the end, NALC — not Noble — made the decision to allow the placement of campaign advertisements in certain issues of the *Postal Record*. If NALC wanted the *Postal Record* to be entirely free of campaign

21

literature, it could easily change its policies. But NALC should not be permitted to prevent *bona fide* candidates for office from making reasonable requests for the distribution of campaign literature through the *Postal Record* based on arbitrary rules. *See Brown*, 498 U.S. at 475. Because NALC failed to demonstrate that complying with Noble's request would cause "administrative or financial hardship to the Union" or "discriminated against any other candidate," this Court should reverse. *See id.*

### 6. The District Court Erroneously Ignored Noble's Status as a Pro Se Litigant.

NALC does not dispute that the district court should have liberally construed the complaint in light of Noble's pro se status. Nor does it dispute that the district court failed to inform Noble of the applicable pleading standard or permit Noble an opportunity to amend, as required by *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 877–78 (D.C. Cir. 1993).[9] Instead, NALC argues (1) that there was no reason for the district court to construe Noble's complaint as asserting a "similar distribution" claim under LMRDA § 401(c); and (2) it would have been futile to give Noble an

---

[9] In fact, NALC ignores this case entirely.

opportunity to amend because "examination of the *Postal Record* shows that it did not constitute campaign literature by NALC's incumbent officers." *See* Resp. Br. at 24–29.

Liberally construed, however, the factual allegations made by Noble suggest that Noble intended to make a "similar distribution" claim under LMRDA § 401(c). For example, Noble alleged:

- "The union and its incumbent officers use the magazine and branch publications to communicate with the membership." JA000023.

- "The *Postal Record* … prominently features the activities of the union's incumbent officers, against whom Clean Sweep are running in the election." JA000024.

- "The incumbent officers against whom plaintiff and Clean Sweep are running take advantage of the powers of incumbency to put their accomplishments before the union electorate, at union expense." JA000034.

- "The monthly magazine carries regular columns from all of the incumbents, as well as stories showing their photographs and praising their accomplishments." JA000034–35.

23

- "The ability of union incumbents to deploy the union's own resources in this manner is among the reasons why insurgent candidates need access to those same modes of communication to have a fair chance to compete in the upcoming union election." JA000035.

- "NALC publishes a monthly magazine, the *Postal Record*, which is mailed to every member. NALC also publishes the *NALC Bulletin*, which is mailed two or three times a month to every facility in which letter carriers are employed. Both publications make numerous references to Fred Rolando and include photos of him." JA000068.

These allegations, taken together as true and construed liberally in the light most favorable to Noble, suggest that NALC utilizes the *Postal Record* as campaign literature for incumbents and that Noble was entitled to "similar distribution" under LMRDA § 401(c). Indeed, when DOL evaluated similar allegations by Noble against NALC involving the 2018 election, DOL interpreted Noble's claim as one for "similar distribution" under LMRDA § 401(c):

> You also alleged that NALC President Fredric Rolando unfairly delayed your request to place campaign

24

advertisements in the union's monthly magazine, the *Postal Record*. You stated that you requested to buy advertising space in the magazine several months before the mailing of the ballots. You alleged that NALC did not allow a *Postal Record* campaign advertisement until the September 2018 issue, which came out only days before the ballots were mailed. You alleged that this was unfair because Rolando and the other incumbents are in continuous contact with the entire membership through the *Postal Record* and other publications.

Section 401(c) of the LMRDA prohibits disparate candidate treatment. 29 U.S.C. § 481(c). When a union or its officers authorize distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate who requests it. 29 C.F.R. § 452. 67.

*See* JA000052–53. While NALC may disagree that Noble's current allegations are sufficient to state a "similar distribution" claim under LMRDA § 401(c), Noble should have been informed by the district court of the proper legal standard and at least provided an opportunity to amend before dismissal. *See Moore*, 994 F.2d at 877–78.

NALC's contention that amendment would have been futile is based on its own self-serving review of the contents of a cherry-picked issue of the *Postal Record*. *See* Resp. Br. at 26–29. The Court should decline NALC's invitation to engage in fact-finding on appeal when the district

court has not considered the issue, especially considering that the record is incomplete (consisting of the June 2022 issue only), and it is extrinsic to the complaint. *See Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) ("[T]he Court of Appeals should not ... resolve[] in the first instance [a] factual dispute which has not been considered by the District Court."); *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 703 (D.C. Cir. 2022) ("Factfinding is the basic responsibility of district courts, rather than appellate courts, and in this regard, we are fully cognizant of our limitations.") (citations omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, Noble respectfully requests that the Court reverse the district court's dismissal of Noble's claim against NALC and remand for further proceedings.

Dated: July 5, 2023                    Respectfully submitted,

                                        */s/ Daniel F. Olejko*
                                       Daniel F. Olejko
                                       D.C. Circuit Bar No. 64141
                                       BRAGALONE OLEJKO SAAD PC
                                       901 Main St., Ste. 3800
                                       Dallas, Texas 75202
                                       214-785-6670
                                       214-785-6680
                                       dolejko@bosfirm.com

                                       *Counsel for Appellant*
                                       *David W. Noble, Jr.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

    X     The brief contains 5,245 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

    X     The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in a 14-point Century Schoolbook font or

_____ The brief has been prepared in a monospaced typeface using _____ in a ___ characters per inch _____ font.

Dated: July 5, 2023

                           */s/ Daniel F. Olejko*
                           Daniel F. Olejko
                           D.C. Circuit Bar No. 64141
                           BRAGALONE OLEJKO SAAD PC

                           *Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on July 5, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Daniel F. Olejko*
Daniel F. Olejko
D.C. Circuit Bar No. 64141
BRAGALONE OLEJKO SAAD PC

*Counsel for Appellant*
*David W. Noble, Jr.*