IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAVID W. NOBLE, JR.,
*Plaintiff-Appellant*,

v.

NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO,
ALAMO BRANCH 421, AND BRANCH 9 NALC,
*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of Columbia, Case No. 1:22-cv-01613-DLF

**BRIEF OF *AMICI CURIAE* AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS AND LABORERS' INTERNATIONAL UNION OF NORTH AMERICA IN SUPPORT OF APPELLEES' PETITION FOR PANEL REHEARING OR REHEARING EN BANC**

Matthew Ginsburg
**AFL-CIO**
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org

Leon Dayan
Jacob Karabell
Bruce R. Lerner
**BREDHOFF & KAISER, PLLC**
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com
jkarabell@bredhoff.com
blerner@bredhoff.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29, and D.C. Circuit Rule 26.1, American Federation of Labor and Congress of Industrial Organizations and Laborers' International Union of North America hereby certify that neither party has any parent company and that no company has a ten percent or greater ownership interest in the parties.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i
TABLE OF AUTHORITIES................................................................................ iii
INTEREST OF AMICI ........................................................................................1
IMPORTANCE OF THIS CASE ........................................................................1
ARGUMENT .......................................................................................................3
CONCLUSION ..................................................................................................12
CERTIFICATE OF COMPLIANCE..................................................................13
CERTIFICATE OF SERVICE ...........................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Camarata v. Teamsters*,
 478 F. Supp. 321 (D.D.C. 1979), *aff'd without opinion*, 1981 WL
 154071 (D.C. Cir. Jan. 23, 1981) ................................................................................. 2

*Dunlop v. Bachowski*,
 421 U.S. 560 (1975) ........................................................................................................ 2

*Edward J. DeBartolo Corp. v. Fla. Bldg. Trades Council*,
 485 U.S. 568 (1988) ............................................................................................... 6, 7, 9

*Fischer v. U.S.*,
 No. 23-5572 (U.S. June 28, 2024) .................................................................................. 5

*MM&P v. Brown*,
 498 U.S. 466 (1991) ........................................................................................................ 8

*Pac. Gas & Elec. v. Pub. Utils. Comm'n*,
 475 U.S. 1 (1986) ............................................................................................................ 6

*U.S. v. Fischer*,
 64 F.4th 329 (D.C. Cir. 2023) ......................................................................................... 5

*Wirtz v. Glass Bottle Blowers*,
 389 U.S. 463 (1968) ........................................................................................................ 2

**Statutes**

29 U.S.C. §481(c) ................................................................................................... *passim*

**Other Authorities**

29 C.F.R. §452.70 .............................................................................................................. 7

38 Fed. Reg. 18,332 (July 9, 1973) .................................................................................... 7

2 *Legislative History of the LMRDA of 1959* (1959)..................................................10

S. Rep. No. 187, 86th Cong., 1st Sess. (1959).......................................................2, 9

Scalia & Garner, *Reading Law* ...............................................................................6

## INTEREST OF AMICI

The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) is a federation of 60 labor organizations. The Laborers' International Union of North America (LIUNA) is a union of roughly 500,000 members, mostly in the private sector. The vast majority of constituent unions within the AFL-CIO, including LIUNA, are regulated by the statute whose interpretation is at issue here.[1]

## IMPORTANCE OF THIS CASE

The panel's 2-1 decision has sent a shockwave through the labor movement. It reads into Section 401(c) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §481(c), an unprecedented imposition on unions: They must now surrender editorial control over their newspapers, magazines, websites, and other publications upon the request of any candidate for union office who wishes to place a paid campaign advertisement in the publication in question. On the majority's interpretation of §401(c), even when a union does not use its publications to promote any candidacies or accept any form of paid ads, the union is now under a presumptive duty to publish individual candidates' campaign literature in any publication disseminated under the union's own masthead.

---

[1] This brief is filed pursuant to a June 28, 2024 motion. No counsel for any party authored it in whole or part. Apart from Amici, no person contributed money intended to fund the brief's preparation and submission.

1

It would be surprising for a court to impute to any Congress an intent to impose such an intrusive regulation on a private association's ability to engage in self-expression, but it is astonishing to impute such an intent to the Congress that enacted the LMRDA. In a portion of the Senate Committee Report that the Supreme Court has repeatedly quoted in interpreting the LMRDA, the Act's drafters described the statute as expressing a "philosophy of legislative restraint" that "recognized the desirability of minimum interference by Government in the internal affairs of any private organization." S. Rep. No. 187, 86th Cong., 1st Sess., at 7 (1959) (quoted in *Dunlop v. Bachowski*, 421 U.S. 560, 568 n.8 (1975); *Wirtz v. Glass Bottle Blowers*, 389 U.S. 463, 471 n.10 (1968)).

The LMRDA's 65th anniversary is this year, and until now, §401(c) always had been understood by the AFL-CIO and its member unions, consistent with that legislative history, as imposing a more modest requirement: A union must provide candidates with access to the union's "distribution machinery," *id.* at 20, such as its mailing lists, so that there is a mechanism by which candidate literature (over which the *candidate* exercises editorial control) can reach the same audience as the union's own member communications (over which the *union* retains editorial control). Indeed, decades ago, this Court affirmed a district court decision that swiftly rejected the argument that §401(c) compelled a union to open its newspaper to candidate advertisements. *Camarata v. Teamsters*, 478 F. Supp. 321, 329-30 (D.D.C. 1979) (no

2

§401(c) violation where union denied candidate request "seek[ing] access to the [union's magazine] to further his campaign for general president"), *aff'd without opinion*, 1981 WL 154071 (D.C. Cir. Jan. 23, 1981).

By departing from that understanding, the majority did not merely upend settled practice. It severely misconstrued the text of the statute. Correcting the majority's statutory-construction error is of vital importance, as it will restore unions' freedom of self-expression and obviate the need to reach the constitutional question tendered in Appellees' petition.

## ARGUMENT

LMRDA §401(c) provides in pertinent part:

> Every national…and every local labor organization…shall be under a duty, enforceable at the suit of any bona fide candidate…to comply with all reasonable requests of any candidate *to distribute by mail or otherwise* at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate *with respect to the use of lists of members.*

29 U.S.C. §481(c) (emphases added).

A. The majority made three interpretive leaps in construing this provision, each of which was a serious error in itself. Their cumulative effect was to turn §401(c) into something unrecognizable as the work of the LMRDA Congress.

*First,* the majority treated the five-word phrase "distribute by mail or otherwise" as if it said "distribute" *simpliciter*. Majority at 7-8.

3

*Second*, the majority treated the word "distribute" as if it were fully synonymous with the word "publish." It did so based not on anything in the text or the legislative history of the LMRDA, but on how the word "distribute" was used in the Freedom of Information Act (FOIA), a distinct and later-enacted statute furthering entirely different policies than the LMRDA. Majority at 7.

*Third*, and perhaps most consequentially, the majority, without explanation, treated the extra-statutory word "publish" as if it meant "publish *in the labor organization's own publications*."

The cumulative effect of these leaps is to interpret §401(c) as if it said: "Every labor organization shall be under a duty, enforceable at the suit of any bona fide candidate, to comply with all reasonable requests of any candidate *to publish in the labor organization's own publications* at the candidate's expense campaign literature in aid of such person's candidacy."

This fundamental revision of §401(c)'s text conflicts with numerous basic canons of statutory construction.

The majority's initial leap was to treat distribution "by mail or otherwise" as if it encompassed all forms of distribution rather than just distribution in the nature of mail distributions. Majority at 8. That violated the canon of superfluity, as it gave no meaning to Congress' reference to "by mail" as the baseline means of distribution and instead treated "otherwise" as a broad "catch-all." *Id.* To support that "catch-

all" construction of "otherwise," the majority principally relied on *U.S. v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), a decision the Supreme Court just reversed— precisely on the ground that this Court failed to heed the canon against superfluity. *Fischer v. U.S.*, No. 23-5572, slip op. at 5 (U.S. June 28, 2024). In *Fischer*, the Supreme Court held that "otherwise" in 18 U.S.C. §1512(c)(2) must be read narrowly in light of the "the specific text that accompanies it," and *not* as a broad catchall, lest the prior specific text be rendered "surplusage" "with no work to do." *Id.* at 8, 12. So too here as to §401(c).

If the majority here had heeded the superfluity canon, it would have recognized there is a ready explanation for why Congress chose to modify "distribute" in §401(c) with the "by mail" clause and why it chose to include a requirement of non-discrimination as to a union's "list of members." Those drafting choices make perfect sense if Congress contemplated the distribution of campaign literature through member address lists or similar contact lists. And they make little sense if Congress thought that unions would be required to publish candidates' campaign literature within the union's own publications, since, in that event, those publications necessarily would reach all members on the union's contact lists.

The majority's second leap was equally unjustified. The majority treated the word "distribute" in the LMRDA as synonymous with "publish" simply because the later-enacted FOIA uses "distribute" in that sense. While it is fair to presume

5

consistent usage within a single statute, it is a fallacy to do so "across the whole *corpus juris*" and borrow meaning from "a different statute altogether." Scalia & Garner, *Reading Law* 172. Judge Henderson's dissent persuasively develops this point. Dissent at 3-6.

As to the majority's final and most fateful leap—treating "publish" as "publish in the labor organization's own publication"—that move, apart from lacking any textual basis, offends the canon of constitutional avoidance. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Bldg. Trades Council*, 485 U.S. 568, 575 (1988).

As Appellees' petition demonstrates, the Supreme Court has repeatedly struck down laws that compel *any* speaker—whether or not part of the institutional press—to integrate third-party views and content into the speaker's own publication. Petition at 3-6; *Pac. Gas & Elec. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8 (1986) (utility company's First Amendment rights violated by state regulation that required it to include in the same envelope as its monthly newsletter a ratepayer-advocacy group's counterpoint literature). At the very least, then, the majority's interpretation of §401(c) raises a serious constitutional question.

Therefore, before addressing that constitutional question, the majority should have considered whether there was an available interpretation of §401(c) that would have avoided it. And while courts should not contort a statute to avoid a constitutional question, *DeBartolo*, 485 U.S. at 575, here the majority unnecessarily expanded the reach of §401(c) to *create* one.

This intrusion on union self-expression and editorial control is especially severe once one takes account of a 51-year-old Department of Labor regulation that quite appropriately prohibits a union, when distributing candidate literature pursuant to §401(c)'s "by mail or otherwise" requirement, from censoring or exercising any editorial control over such literature:

> **Contents of literature.**
>
> The Act does not and unions may not regulate the contents of campaign literature which candidates may wish to have distributed by the union. This is left to the discretion of each candidate. The labor organization may not require that it be permitted to read a copy of the literature before it is sent out, nor may it censor the statements of the candidates in any way, even though the statement may include derogatory remarks about other candidates. Furthermore, a union's contention that mailing of certain campaign literature may constitute libel for which it may be sued has been held not to justify its refusal to distribute the literature, since the union is under a statutory duty to distribute the material.

29 C.F.R. §452.70; *see* 38 Fed. Reg. 18,332 (July 9, 1973) (promulgating rule).

This regulation presupposes that the candidate literature a union is required to distribute via §401(c) is literature separate from, not integrated into, the union's own publications; a union can hardly refrain from reading something it must publish

7

under its own masthead. It also presupposes that a union cannot invoke the statute's requirement that a candidate distribution request be "reasonable" to reject profane, false, scurrilous, or even libelous literature. As the Supreme Court held in *MM&P v. Brown*, 498 U.S. 466 (1991), the "reasonableness" limitation permits a union to reject a candidate's distribution request based on factors such as any "administrative or financial hardship" to the union or "discriminat[ion] against any other candidate," *id.* at 478, but *not* based on concerns about the content of the candidate's literature.

Thus, to maintain both this longstanding regulation and the majority's interpretation of §401(c) would be to impute to Congress an intent to require a union to publish statements by candidates *in its own newspaper* that violate the union's standards of accuracy and decency. Such a result deeply offends the Constitution. And it would have been avoided by reading §401(c) as written—that is, as a fair and effective requirement that a union distribute a candidate's literature by sending it to members as a standalone document through the mail or other delivery methods used by the union.

It is true that Appellees here choose, independent of §401(c), to open their magazine's quadrennial pre-election edition to campaign advertisements. But, by construing the phrase "distribute by mail or otherwise" to mean "publish in the union's own publications," the majority would subject a union whose magazine never ran campaign advertisements to the same "publication" requirement.

8

Moreover, the serious constitutional questions raised by the majority's interpretation exist whether or not a union chooses to open one edition of its magazine to paid advertisements. Either way, the union is deprived of editorial control over its publications, only with the perverse twist of providing it with an inducement to abandon any practice of sponsoring a forum for candidate speech, like a "voter's guide" edition of a magazine or newsletter. Loss of such forums would disserve the type of discussion the LMRDA was meant to foster.

 **B.** Nor is this a case where a construction that avoids a serious constitutional issue should be discarded as "plainly contrary to the intent of Congress." *DeBartolo*, 485 U.S. at 575. Just the opposite, as legislative history unequivocally confirms that Congress intended the reading we have outlined and that the dissent embraced.

 In the Senate Committee Report discussed above—the only pre-conference committee report to analyze the specific statutory language that ultimately became §401(c)—the drafters explained that the bill provided certain "guarantees of fair elections," including that "[e]very candidate for local union office is entitled through use of union mailing lists and *distribution machinery* to distribute at his own expense material in support of his candidacy to every member of the union." S. Rep. No. 187, 86th Cong., 1st Sess., at 20 (emphasis added). Plainly, no one would refer to the pages of a newspaper or magazine as the "distribution machinery" of its authors.

9

And interpreting §401(c) to require a union to use its "distribution machinery," such as its mailing list and mailroom equipment, is further confirmed by the floor statement of Senator John McClellan, who chaired the special Senate committee hearings that led to the LMRDA. The provision that became §401(c), the Senator explained, "would simply permit [a candidate] to send his campaign material to the union and have the union mail it out." 2 *Legislative History of the LMRDA of 1959* at 1240 (1959); *see also* Dissent at 7-10 (further discussing LMRDA's legislative history).

**C.** We are mindful that the panel's disposition was to remand for further proceedings that would allow Appellees an opportunity to show that the plaintiff candidate's request for publication in the union magazine was "unreasonable." Majority at 10-11. But, according to the majority opinion, "unreasonableness" in this context requires courts to "consider factors such as any financial hardship suffered by the union, any administrative burden imposed on the union, and any discrimination against other candidates." Majority at 11. It is far from clear whether a union that wished to stand on its basic right of editorial control over its own magazine as the basis for denying a candidate's publication request could prevail under those factors.

But, more fundamentally, labor unions should not be forced to bear the burden of justifying their desire to exercise their basic freedom of expression to a court—

and they certainly should not be forced to do so under the LMRDA, through which Congress expressed a philosophy of "minimum inference" in union affairs. *See supra* p. 2. Yet that is the regime that unions face under even the most charitable reading of the panel's decision: A union surrenders editorial control over its publications unless it can show, at "summary judgment or trial," Concurrence at 3, that a demand for space in its publications is unreasonable. Under such a regime, fear of the costs of litigation up to summary judgment or trial—not to mention the risk that, after all that, a judge will decide that the "balanc[e] of hardships" tips against the union, Majority at 11—is apt to cause all but the most well-resourced unions simply to cede editorial control of their own publications upon a candidate's request. This would render merely theoretical most unions' ostensible opportunity to secure vindication of their right of editorial control over their publications.

Rehearing is therefore necessary to forestall a severe inhibition on union self-expression that Congress could not have intended.

# CONCLUSION

Amici respectfully request that the petition be granted.

DATED: June 28, 2024

Respectfully submitted,

Matthew Ginsburg
**AFL-CIO**
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org
*Counsel for Amicus AFL-CIO*

/s/ Leon Dayan
Leon Dayan
Jacob Karabell
Bruce R. Lerner
**BREDHOFF & KAISER, PLLC**
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com
jkarabell@bredhoff.com
blerner@bredhoff.com
*Counsel for Amici AFL-CIO and LIUNA*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 29(b)(4) because it contains 2,589 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

DATED: June 28, 2024                          */s/ Leon Dayan*
                                                           Leon Dayan

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the foregoing motion with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Leon Dayan*
Leon Dayan