ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7012

# In the United States Court of Appeals for the District of Columbia Circuit

**DAVID W. NOBLE, JR.**

*Plaintiff-Appellant,*

**v.**

**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO, ALAMO BRANCH 421, AND BRANCH 9 NALC,**

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF FOR APPELLANT**

_____

Daniel F. Olejko
BRAGALONE OLEJKO SAAD PC
901 Main St., Ste. 3800
Dallas, Texas 75202
214-785-6670
dolejko@bosfirm.com

*Counsel for Plaintiff-Appellant
David W. Noble, Jr.*

Dated: May 15, 2023

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Plaintiff-Appellant David W. Noble, Jr. submits the following information in accordance with Circuit Rule 28(a)(1):

### Parties and Amici

The parties to this case are Plaintiff-Appellant David W. Noble, Jr. and Defendants-Appellees National Association of Letter Carriers, AFL-CIO ("NALC"), NALC Alamo Branch 421, and NALC Branch 9. At present, there are no amici curiae or intervenors in this case.

### Rulings Under Review

Appellant seeks review of the order of dismissal and memorandum opinion of the U.S. District Court for the District of Columbia filed on December 13, 2022, in *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO, et al.*, No. 1:22-cv-01613-DLF, 2022 WL 17613057 (D.D.C. Dec. 13, 2022). JA000296–309.

### Related Cases

The case on review has not been previously before this Court or any other court. To the best of counsel's knowledge, no other related cases are currently pending in this Court or in any other federal court of appeals, nor in any other court in the District of Columbia.

i

Dated: May 15, 2023

*/s/ Daniel F. Olejko*
Daniel F. Olejko
D.C. Circuit Bar No. 64141

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES,  RULINGS, AND
RELATED CASES .................................................................... i

TABLE OF CONTENTS ........................................................... iii

GLOSSARY ............................................................................ vii

STATEMENT REGARDING ORAL ARGUMENT ................... 1

STATEMENT OF JURISDICTION ........................................ 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....... 3

PERTINENT STATUTES ....................................................... 5

STATEMENT OF THE CASE ................................................. 9

   A.  Procedural History ...................................................... 9

   B.  Statement of Facts ....................................................... 12

ARGUMENT ........................................................................... 20

   A.  The District Court Erred by Applying an Overly Narrow
   Interpretation of LMRDA § 401(c). ................................ 20

      1.  Standard of Review ................................................. 21

      2.  The District Court's Narrow Interpretation of LMRDA § 401(c)
      Is Inconsistent with the Text, Structure, and Purpose of
      the Statute ............................................................... 21

   B.  The District Court Erroneously Determined that Noble's
   Complaint Failed to State a Claim for Relief. .................... 29

      1.  Standard of Review ................................................. 30

2.   The District Court Erroneously Ignored Noble's Status as a Pro Se Litigant.......................................................................31

3.   Noble Plausibly Alleged that His Request for NALC to Distribute His Campaign Literature Was Reasonable....................34

CONCLUSION..............................................................................37

CERTIFICATE OF COMPLIANCE.........................................39

CERTIFICATE OF SERVICE ...................................................40

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allegheny Def. Proj. v. Fed. Energy Reg. Comm'n*,
    964 F.3d 1 (D.C. Cir. 2020) .................................................................22

*Bliss v. Holmes*,
    721 F.2d 156 (6th Cir. 1983) .............................................................24

*Bowman v. Iddon*,
    848 F.3d 1034 (D.C. Cir. 2017) .........................................................31

*Dimondstein v. Am. Postal Workers Union*,
    964 F. Supp. 2d 37 (D.D.C. 2013) .....................................................25

*Erickson v. Pardus*,
    551 U.S. 89 (2007) .......................................................................31–32

*Guzman v. Local 32B-32J, Serv. Empl. Int'l Union, AFL-CIO*,
    151 F.3d 86 (2d Cir. 1998)...........................................................23, 26

*Hodgson v. United Mine Workers Union*,
    344 F. Supp. 17 (D.D.C. 1972) .............................................11, 33, 36

*Howard v. Office of Chief Admin. Officer of U.S. House of*
    *Representatives*,
    720 F.3d 939 (D.C. Cir. 2013) ...........................................................31

*International Organization of Masters, Mates & Pilots v. Brown*,
    498 U.S. 466 (1991) ...................................24, 27–29, 35–37

*Knox County Local, National Rural Letter Carriers' Association v.*
    *National Rural Letter Carriers' Association*,
    720 F.2d 936 (6th Cir. 1983) .......................................................11, 36

*Moore v. Agency for Int'l Dev.*,
    994 F.2d 874 (D.C. Cir. 1993) ...........................................................32

*Noble v. Dunn*,
    895 F.3d 807 (D.C. Cir. 2018) ...........................................................21

*Shimman v. Miller*,
  995 F.2d 651 (6th Cir. 1993) ............................................................36

*Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div., ILA, AFL-CIO*,
  538 F.2d 946 (2d Cir. 1976)..............................................................24

*VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*,
  992 F.3d 1097 (D.C. Cir. 2021) ........................................................30

*Yablonski v. United Mine Workers of Am.*,
  305 F. Supp. 876 (D.D.C. 1969) ..................................................33, 36

## Statues, Regulations, and Rules

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................2

LMRDA § 101(a), 29 U.S.C. § 411(a)........................................28–29, 36

LMRDA § 401(c), 29 U.S.C. § 481(c) ..............1, 3–4, 9–11, 18–29, 33–37

LMRDA § 401(e), 29 U.S.C. § 481(e) ....................................................28

3 DCMR 3018, Identification of Campaign Literature (2019)..............26

Fed. R. Civ. P. 12(b)(3)........................................................................2

Fed. R. Civ. P. 12(b)(6)........................................................2–3, 18, 30–31

## Other Authorities

Webster's Third New International Dictionary (2002) ..........................23

# <u>GLOSSARY</u>

LMRDA              Labor Management Reporting and Disclosure Act

                   (Landrum Griffin Act), 29 U.S.C. § 401, *et seq.*

NALC               Defendant-Appellee National Association of Letter

                   Carriers, AFL-CIO

Branch 421         Defendant-Appellee Alamo Branch 421

Branch 9           Defendant-Appellee Branch 9 NALC

Local Branches     Defendant-Appellees  Alamo  Branch  421  and

                   Branch 9 NALC

Noble              Plaintiff-Appellant David W. Noble, Jr.

USPS               United States Postal Service

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Noble respectfully requests oral argument. This appeal addresses whether Section 401(c) of the LMRDA, 29 U.S.C. § 481(c), requires a national labor organization to distribute a campaign advertisement in aid of such person's candidacy, at the candidate's expense, in a union magazine, when that magazine is consistently used by incumbents to promote themselves. Oral argument of the facts and applicable law would benefit the Court in ruling on the matter.

## STATEMENT OF JURISDICTION

The U.S. District Court for the District of Columbia had jurisdiction under 29 U.S.C. § 481(c) and 28 U.S.C. § 1331. After the district court entered an order and memorandum opinion dismissing Noble's lawsuit on December 13, 2022,[1] Noble filed a timely notice of appeal on January 11, 2023.[2] JA000007; JA000296–309. This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the U.S. District Court for the District of Columbia.

---

[1] The district court dismissed Noble's claim against NALC with prejudice under Rule 12(b)(6) and dismissed Noble's claims against the Local Branches without prejudice for improper venue under Rule 12(b)(3). JA000296.

[2] At the district court's request, Noble re-filed the notice of appeal on January 26, 2023, under a different ECF event. JA000007.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

On appeal, Noble seeks review of the following issues related to the district court's dismissal of Noble's claim against NALC:

1. Does Section 401(c) of the LMRDA, which states that labor organizations "shall be under a duty … to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization," merely require unions to coordinate the delivery of a candidate's standalone, already-printed material to campaign members?

2. In concluding that Noble's complaint failed to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), and finding that Noble failed to allege that the *Postal Record* is essentially campaign literature in favor of incumbents, did the district court err by ignoring Noble's pro se status, failing to construe the operative complaint liberally in Noble's favor, and failing to provide Noble with fair notice of the pleadings requirements and an opportunity

3

for leave to amend?

3. Accepting the facts of Noble's complaint as true, giving it a
   liberal construction in view of Noble's pro se status, and
   considering the facts alleged in Noble's other pleadings and
   pro se affidavits, did Noble plausibly allege that his request
   for NALC to distribute his campaign literature as part of the
   *Postal Record* was "reasonable" under LMRDA § 401(c)?

# PERTINENT STATUTES

## TERMS OF OFFICE; ELECTION PROCEDURES

(29 U.S.C. § 481)

SEC. 401.

(a) Every national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.

(b) Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing.

(c) Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and

5

its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

(d) Officers of intermediate bodies, such as general committees, system boards, joint boards, or joint councils, shall be elected not less often than once every four years by secret ballot among the members in good standing or by labor organization officers representative of such members who have been elected by secret ballot.

(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary

6

authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

(f) When officers are chosen by a convention of delegates elected by secret ballot, the convention shall be conducted in accordance with the constitution and bylaws of the labor organization insofar as they are not inconsistent with the provisions of this title. The officials designated in the constitution and bylaws or the secretary, if no other is designated, shall preserve for one year the credentials of the delegates and all minutes and other records of the convention pertaining to the election of officers.

(g) No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

(h) If the Secretary, upon application of any member of a local labor organization, finds after hearing in accordance with the Administrative Procedure Act that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of

an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot conducted by the officers of such labor organization in accordance with its constitution and bylaws as they are not inconsistent with the provisions of this title.

(i) The Secretary shall promulgate rules and regulations prescribing minimum standards and procedures for determining the adequacy of the removal procedures to which reference is made in subsection (h).

Enacted September 14, 1959, P.L. 86–257, title IV, sec. 401, 73 stat. 532.

## STATEMENT OF THE CASE

This appeal involves the refusal of NALC, a national labor union, to disseminate Noble's campaign literature in its monthly magazine, the *Postal Record*, at the candidate's own expense in violation of Section 401(c) of the LMRDA, and the district court's failure to accord the allegations of Noble's complaint a liberal construction in light of Noble's pro se status.

### A. Procedural History

Noble filed this lawsuit pro se against NALC on June 7, 2022, alleging that NALC violated LMRDA § 401(c) by refusing to include an advertisement supporting Noble's candidacy for NALC president in the *Postal Record* at Noble's own expense. JA000009–10. In an amended complaint filed on June 17, 2022, Noble added the Local Branches as defendants, supplemented his factual allegations, added claims under LMRDA § 401(c) against the Local Branches because they had refused to distribute Noble's campaign literature in their monthly newsletters, and added a request for injunctive relief. JA000022–26.

On June 17, 2022, Noble filed a motion for preliminary injunction against NALC and the Local Branches, seeking an order compelling

9

NALC and the Local Branches to allow Noble, at his own expense, to send his campaign literature to the union membership via advertisements in NALC's and the Local Branches' monthly publications. JA000027–36. Following briefing and a hearing on July 8, 2022, the district court denied Noble's motion for preliminary injunction. JA000234.

On August 5, 2022, NALC and the Local Branches filed a motion to dismiss. JA000235–236. The Local Branches argued that Noble's claims failed as a matter of law because (a) the Local Branches do not maintain their principal offices in the District of Columbia and (b) Noble was not running as a candidate for office of the Local Branches. JA000246–247. NALC argued that Noble's claim was moot because all issues of the *Postal Record* preceding the 2022 election had been published and that, even if Noble's claim was not moot, LMRDA § 401(c) did not require NALC to publish Noble's campaign literature in the *Postal Record*. JA000247–252.

Noble opposed the motion to dismiss on various grounds, arguing that the Local Branches failed to demonstrate that they were separate from NALC, that his claim against NALC was not moot because he may run for office in the next election, and that various authorities supported Noble's claim that LMRDA § 401(c) required NALC to publish his

campaign literature in the *Postal Record*, including, *inter alia*, *Hodgson v. United Mine Workers Union*, 344 F. Supp. 17 (D.D.C. 1972), and *Knox County Local, National Rural Letter Carriers' Association v. National Rural Letter Carriers' Association*, 720 F.2d 936 (6th Cir. 1983). JA000257–261.

On November 8, 2022, the district court issued an order noting that NALC's election concluded on October 27, 2022, and invited the parties to respond if they disagreed. JA000006. Noble filed a response to the Court's order on November 13, 2022. JA000279–280.

The district court granted the motion to dismiss on December 13, 2022. JA000296. In a memorandum opinion, the district court rejected NALC's argument that Noble's claim was moot because Noble's claim fell into the exception of being capable of repetition yet evading review. JA000301–303. Nevertheless, the district court agreed that it lacked venue over Noble's claims against the Local Branches because they maintained principal offices in other districts and that LMRDA § 401(c) did not require NALC to publish an advertisement supporting Noble's candidacy in the *Postal Record*. JA000303–309.

The district court ruled that LMRDA § 401(c) merely requires

unions to coordinate the delivery of a candidate's standalone, already-printed material to campaign members and does not require unions to print advertisements in monthly magazines. JA000305–306. The district court also found that Noble's request was not reasonable because it would "alter the nature of the *Postal Record* by requiring it to print advertising and campaign material it otherwise would not." JA000306–307. In particular, the court noted that "Noble has not alleged here that the *Postal Record* is campaign literature in favor of the incumbents such that he should get equal space in the magazine." JA000307–308. Further, the court held that Noble had no general right to publication of his views in the *Postal Record*. JA000308–309.

On January 11, 2023, Noble timely filed his notice of appeal to this Court. JA000007.

### B. Statement of Facts

Noble was hired by the USPS as a city letter carrier in 1976 and joined NALC at the same time. JA000008; JA000023; JA000067; JA000279. NALC is the exclusive bargaining agent for city letter carriers employed by the USPS. JA000008; JA000023; JA000067. In 1979, Noble took leave from postal employment with USPS to begin working at

NALC, first at NALC's Minneapolis regional office and then at NALC headquarters in Washington, DC. JA000067. He was appointed to both positions by Vincent R. Sombrotto, who was then president of NALC. JA000067. Noble worked at NALC until 1993.[3]

Every four years, NALC has elections for officers, including president, through mail-in ballots. JA000008–9; JA000023; JA000067. NALC elections are conducted by an election committee appointed by the NALC president. JA000068. In the 134-year history of NALC, only one challenger has defeated an incumbent president (in 1978). JA000023; JA000068; JA000264. The incumbents have many built-in advantages over challengers. JA000068. They have large NALC salaries and often take their postal retirements on top of them. JA000068. For example, Fred Rolando, the president preceding the 2022 election, had a salary of $218,000 in 2021 and additionally received a postal retirement of

---

[3] In 1993, Noble discovered that union officers were making under-the-table payments to themselves and reached a disagreement with Sombrotto about the propriety of those payments. JA000067. After Noble informed the membership about the payments, Sombrotto suspended Noble from his headquarters position. JA000067. In 1994, after being featured in a CNN story about the under-the-table payments, Noble filed a lawsuit against Sombrotto in federal court relating to the payments. JA000067–68. The lawsuit lasted for 24 years, but was eventually dismissed in 2018. JA000067–68.

$40,000–$50,000. JA000068. Challengers—currently employed or retired letter carriers—make about a quarter of that amount. JA000068.

Further, the 28 executive council members customarily run for election as a team and pool their resources, such that they can afford to make political mailings to all members. JA000068. NALC has approximately 280,000 members, who are (or were) employed in 13,000 facilities across the country. JA000024. In 2022, Noble estimated that it would cost a challenger over $300,000 to mail campaign literature to each of NALC's members. JA000024; JA000035; JA000069. In fact, no challenger has ever been able to raise enough money to make a full mailing to NALC's membership. JA000068; JA000264.

In addition, NALC's president controls a large patronage system. JA000068. For example, Rolando made hundreds of appointments to well-paid positions in NALC headquarters and in NALC's fifteen regional offices during his tenure as NALC president. JA000068. The appointees promote the incumbents to working letter carriers and make contributions to the incumbents' election war-chest. JA000068. Similarly, the incumbents are permitted to enter postal facilities and talk with letter carriers, but challengers are not permitted to enter postal

facilities other than the facilities where they work. JA000068.

Critically, NALC publishes a monthly magazine, the *Postal Record*, which is mailed to every NALC member each month and may be viewed at any time at NALC.org. JA000024; JA000031; JA000068. The *Postal Record* prominently features the activities of NALC's incumbent officers. JA000024. Each of the ten incumbent resident officers has a full-page column in the magazine. JA000031. The magazine also includes stories showing the incumbents' photographs and praising their accomplishments. JA000034–35; JA000068. While incumbent officers are permitted to use the *Postal Record* to promote themselves on a regular basis, NALC prohibits other candidates from running political advertisements in the *Postal Record*, except for a single issue preceding each election. JA000011. Further, NALC allows members to place advertisements for mutual transfers in every issue of the *Postal Record*. JA000025; JA000069.

In 2014, Noble decided to run as a candidate for NALC president against Rolando. JA000068; JA000279. In the 20 years preceding Noble's first run for NALC president, no other person had challenged an incumbent president. JA000068. Although his first run for NALC

president was unsuccessful, Noble ran against Rolando again in 2018.[4] JA000023–24; JA00068; JA000279. In 2018, Noble was able to compel NALC to allow Noble to use NALC's library of 80,000 emails address to send his campaign materials. JA000226; JA000264. Notwithstanding, Noble lost the 2018 election to Rolando. JA000068.

In 2022, Noble ran with several other candidates as a slate called "Clean Sweep" in opposition to NALC's incumbent leadership. JA000024. Noble's opponent in 2022 was Brian Renfroe, who was the incumbent executive vice president of NALC. JA000279. The Clean Sweep campaigns primarily online through several groups on the social media platform, Facebook, which are administered by Noble. JA000024; JA000069. Although Noble's Facebook groups have approximately 56,000 members, Noble estimates that he reaches only about 10% of NALC's membership by posting online. JA000024; JA000069. Unlike 2018, Noble

---

[4] In both 2014 and 2018, the election committees appointed by the incumbent union officers prevented Noble from observing the counting and tallying of ballots and had Noble arrested. JA000023–24; JA000068. The charges against Noble were dismissed following each election. JA000024; JA000068. Noble has sued the police for false arrest and false imprisonment related to the 2018 election and, through discovery, learned that the police witnessed no misconduct by Noble, but instead based their arrest on statements from election committee members. JA000067–68.

was unable to send his campaign materials via email in 2022 because, following the 2018 election, NALC destroyed its email address library. JA000226; JA000264.

Because Noble could not effectively reach all of NALC's members through only online posting, and he could not afford the expense of a nation-wide political mailing (Noble is retired and has income of about $60,000 per year), Noble contacted Rolando on December 18, 2021 to request that NALC place ads promoting his candidacy in the *Postal Record*, beginning with the February 2022 issue. JA000011–13; JA000024–25; JA000069; JA000227. Noble offered to pay the expenses associated with running a full-page advertisement in the *Postal Record*, which cost $2,750 in 2022—less than 1/100th of the amount needed to send campaign literature to NALC's membership via first-class mail. JA000024; JA000035; JA000069; JA000264. Noble's advertisement included his campaign literature, which was "an intellectual response to the viewpoints expressed in the *Postal Record* by the incumbent officers." JA000069.

On December 29, 2021, NALC refused Noble's request, except for a single issue in August/September 2022, citing "longstanding NALC

policy." JA000011; JA000025. No such policy has ever been submitted to the NALC membership for debate, approval, or comment. JA000025; JA000069. Further, Noble was concerned that the membership would not receive the August/September issue in time to cast their ballots, given the deterioration in the mail service. JA000069–70. Noble requested that the Local Branches run similar advertisements, but his requests were either denied or ignored. JA000025; JA000069.

As a result, Noble filed the instant lawsuit against NALC and the Local Branches alleging that they violated LMRDA § 401(c) by refusing Noble's reasonable requests for them to place Noble's campaign advertisements in their publications at Noble's expense.

## SUMMARY OF ARGUMENT

The district court erred in concluding that Noble failed to state a claim for relief against NALC under Rule 12(b)(6).

1. The district court's decision is premised on an overly narrow interpretation of LMRDA § 401(c), which is inconsistent with the text, structure, and purpose of the statute. The statute's broad language requires unions to "distribute by mail or otherwise … campaign literature," so long as the request is "reasonable." 29 U.S.C. § 481(c). It

applies to *any* method of distribution of *any* printed matter related to a campaign, including the distribution of a campaign advertisement through its inclusion in a larger publication, such as a magazine. None of the dictionary definitions cited by the district court restrict LMRDA § 401(c) to the delivery of standalone, already-printed materials. The district court's narrow interpretation is inconsistent with the purpose of LMRDA § 401(c), which is ensure free and democratic union elections and offset the advantages of incumbents, who have free use of the union press to promote themselves. Further, the structure of the statute makes clear that a candidate's request under LMRDA § 401(c) does not need to follow the union's rules. It must only be reasonable.

2. Noble was a pro se plaintiff. Yet the district court ignored this fact and dismissed his complaint, holding him to the same standard as a lawyer. The district court failed to construe the complaint liberally, failed to consider the statements in Noble's other pleadings and pro se affidavits, and failed to provide Noble with fair notice of the pleading standards and an opportunity to amend. Had the district court done so, it would have been forced to conclude that Noble fairly alleged that NALC's incumbents utilized the *Postal Record* as campaign literature,

19

and that Noble was entitled to "similar distribution" of his campaign literature in the *Postal Record* "with equal treatment" under LMRDA § 401(c).

3. The district court also erred in finding that Noble's request was unreasonable. The *Postal Record* clearly permits campaign advertisements. Noble's request was not *per se* unreasonable simply because NALC has a rule that allows those advertisements in just one issue every four years. The reasonableness determination depends on several factors, including whether the request caused administrative or financial hardship to NALC or whether it discriminated against any other candidate, but nothing in the complaint shows that these factors were an issue with Noble's request. On the contrary, the sole basis for NALC's refusal of Noble's request was its purported longstanding policy of running candidate ads in just one issue every four years. But this policy alone could not justify NALC's refusal to grant Noble's request.

## **ARGUMENT**

### A. The District Court Erred by Applying an Overly Narrow Interpretation of LMRDA § 401(c).

The district court held that Section 401(c) of the LMRDA did not require NALC to publish Noble's campaign advertisement in the *Postal*

*Record* because "§ 401(c) is most naturally read to require unions to coordinate the delivery of a candidate's standalone, already-printed material to campaign members." JA000305–306. This interpretation of LMRDA § 401(c) is erroneous because it is inconsistent with the text, structure, and purpose of the statute.

### 1. Standard of Review

This Court "review[s] the district court's interpretation of the LMRDA *de novo*" and "the district court's factual findings for clear error." *Noble v. Dunn*, 895 F.3d 807, 810 (D.C. Cir. 2018).

### 2. The District Court's Narrow Interpretation of LMRDA § 401(c) Is Inconsistent with the Text, Structure, and Purpose of the Statute.

Contrary to the district court's interpretation, LMRDA § 401(c) does not merely "require unions to coordinate the delivery of a candidate's standalone, already-printed materials." JA000305–306. The statute states that every union "shall be under a duty … to comply with all reasonable requests of any candidate to *distribute by mail or otherwise* at the candidate's expense *campaign literature in aid of such person's candidacy* to all members in good standing of such labor organization …." 29 U.S.C. § 481(c) (emphasis added). In other words, the statute required

21

NALC to "distribute by mail or otherwise" any "campaign literature in aid of" Noble's candidacy at Noble's expense. *See id.*

### a. The statute covers any means of distribution, not just the delivery of standalone material.

LMRDA § 401(c) is not limited to the delivery of standalone material. It covers the distribution "by mail *or otherwise*" of any campaign literature. 29 U.S.C. § 481(c) (emphasis added). This language is certainly broad enough to include the distribution of "campaign literature" through its inclusion in another publication, such as a monthly magazine like the *Postal Record*. Indeed, Congress' explicit use of the term "or otherwise" must mean that it intended LMRDA § 401(c) to encompass any means of distribution of "campaign literature," not just the delivery of standalone material. The district court's narrow interpretation cannot be correct because it effectively renders the "or otherwise" language superfluous. *See Allegheny Def. Proj. v. Fed. Energy Reg. Comm'n*, 964 F.3d 1, 15 (D.C. Cir. 2020) ("Agencies, no less than courts, cannot render statutory language a nullity and leave entire operative clauses with 'no job to do.'").

None of the definitions of "distribute" cited by the district court require a narrow interpretation of LMRDA § 401(c) that precludes the

distribution of "campaign literature" through its inclusion in another publication. *See* JA000305–306 ("To 'distribute' means 'to divide among two or more; to deal out,' and, in the mail context, 'to place (the various pieces of mail) in the proper receptacle.'"). In fact, Webster's Third New International Dictionary's broad definition of "distribute" specifically mentions the distribution of magazines. *See* Webster's Third New International Dictionary 660 (2002) ("to give out or deliver esp. to the members of a group <*distributing* magazines to subscribers>"). A union can "distribute," "deal out," "give out," or "deliver" "campaign literature" in a myriad of ways, including by placing that literature in the mail by itself, adding that literature to other pre-planned mailings, or by incorporating that literature into a larger publication. The district court's conclusion to the contrary is incorrect.

### b. The statute does not limit "campaign literature" to "standalone, already-printed material."

As other courts have recognized, "[t]he term 'campaign literature' is not defined by the [LMRDA]." *Guzman v. Local 32B-32J, Serv. Empl. Int'l Union, AFL-CIO*, 151 F.3d 86, 91 (2d Cir. 1998). Notwithstanding, courts have held that the term "campaign literature" in LMRDA § 401(c)

encompasses various different types of publications, including books and newsletters. *See id.* (book); *Bliss v. Holmes*, 721 F.2d 156, 158 (6th Cir. 1983) (newsletter); *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div., ILA, AFL-CIO*, 538 F.2d 946, 949 (2d Cir. 1976) (newsletter). But none of these cases limit "campaign literature" to "standalone, already-printed material." JA000306. Although cited by the district court, the Supreme Court's decision in *International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991), does not stand for such a narrow reading of the statute either. On the contrary, the Supreme Court held in *Brown* that LMRDA § 401(c) deserves a "broad interpretation" in light of its "basic purpose." *Id.* at 476.

Nothing in the statutory text supports the district court's narrow interpretation of "campaign literature." Congress could have clarified that LMRDA § 401(c) applies to only "standalone, already-printed" "campaign literature," but it did not. None of the definitions cited by the district court limit "campaign literature" to "standalone, already-printed material." *See* JA000306. Instead, the definitions make clear that literature is "printed matter of any kind," including, importantly, "advertising." JA000306 ("And campaign 'literature' means 'printed

24

matter of any kind, as *advertising*, campaign leaflets, etc.' … 'Printed matter of any kind; *esp.* leaflets, brochures, etc., used to *advertise* products or provide information and advice.'") (emphasis added). The advertisements submitted by Noble clearly qualify as "printed matter of any kind," as they are written advertisements supporting his candidacy. *See* JA000013; *see also* JA000055–56.

Perhaps recognizing this fact, the district court further narrowed the meaning of "campaign literature" under LMRDA § 401(c) by citing the dictionary definitions of leaflets, handbills, and circulars, which are generally printed on paper as standalone material. JA000306. While leaflets, handbills, and circulars may be *examples* of "campaign literature," they do not (and cannot) define the full scope of the term "campaign literature." For example, "campaign literature" is not limited to *paper* printouts—it also includes electronic materials. *See* JA000052 ("This initial denial of your reasonable requests for campaign email distribution violated the LMRDA."); *see also Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37, 43–49 (D.D.C. 2013) (noting that plaintiffs were likely to succeed on LMRDA § 401(c) claim based on a union's denial of a candidate's request to distribute campaign literature

25

via email).

Further, at least one other court has recognized that "campaign literature" does not have to be standalone material. The Second Circuit held in *Guzman* that a publication may still qualify as "campaign literature" even if "a substantial portion" of the publication "falls outside the scope of § 401(c)." *See* 151 F.3d at 91. Thus, contrary to the district court's ruling, "campaign literature" does not have to be "standalone." JA000306. It may be part of a larger union publication, such as a magazine, that devotes "a substantial portion" of the magazine to unrelated, non-election issues. *See Guzman*, 151 F.3d at 91. Even the D.C. Municipal Regulations recognize that "campaign literature" is synonymous with "political advertising" and includes "newspaper and magazine advertising."[5]

The district court's attempt to narrow the ordinary meaning of

---

[5] *See* 3 DCMR 3018, Identification of Campaign Literature (2019) (applying to "newspaper and magazines advertising; poster; circulator and mailer; billboards; handbills; bumper stickers; sample ballots; initiative, referendum, or recall petitions; radio or television advertisements; paid telephone call and text messaging, digital media advertisements; and other printed and digital material produced by the persons intended to support or oppose: (a) A candidate or group of candidates; or (b) Any initiative, referendum, or recall measure").

"campaign literature" in LMRDA § 401(c) using the definitions of specific examples (i.e., leaflets, handbills, and circulars) was erroneous.

### c. The District Court's Narrow Interpretation of "Campaign Literature" Conflicts with the Structure and Purpose of the Statute.

"The language of § 401(c) explicitly instructs the Union and its officers 'to comply with *all* reasonable requests of *any candidate* to distribute by mail or otherwise at the candidate's expense campaign literature ....'" *Brown*, 498 U.S. at 475 (emphasis in original). "[T]he language of the statute plainly requires unions to comply with 'all reasonable requests,' and just as plainly does *not* require union members to comply with 'all reasonable rules' when making such requests." *Id.* (emphasis in original). Unlike other rules related to elections, and member's speech and voting rights, which are subject to reasonable qualifications and rules, "the § 401(c) right is unqualified." *Id.* Thus, NALC's alleged "longstanding [] policy" of running political ads in only one issue of the *Postal Record* every four years is irrelevant to the question of whether Noble's request fell within § 401(c).

Further, LMRDA § 401(c) is part of Title IV. "The special purpose of Title IV was to ensure free and democratic union elections." *Brown*,

498 U.S. at 476. "The statutory guarantees are specifically designed to offset the 'inherent advantage over potential rank and file challengers' possessed by incumbent union leadership." *Id.* "One of the advantages identified by Archibald Cox in his testimony in support of the Act is the incumbents' control of 'the union newspaper which is the chief vehicle for communication with the members.'" *Id.* Thus, "[a] *broad interpretation* of the candidate's right to distribute literature commenting on the positions advocated in the union press is consistent with the statute's basic purpose." *Id.* (emphasis added). But the district court ignored the purpose underlying LMRDA § 401(c) and, rather than adopt a broad interpretation of the statute as the Supreme Court instructed in *Brown*, the court adopted an interpretation of the statute that is overly restrictive and undermines Noble's ability as a candidate to compete with the inherent advantages of the incumbents.

The district court was apparently concerned that Noble's request went too far and would interfere with NALC's control over the *Postal Record*. *See* JA000306–307. Although "[t]he policy of avoiding unnecessary intervention into internal union affairs is reflected in several provisions of the LMRDA," such as LMRDA §§ 401(e), 101(a)(1),

28

and 101(a)(2), "[t]he[] expressions of respect for internal union rules [in these other provisions] are notably absent in § 401(c)." *Brown*, 498 U.S. at 478. Thus, the district court should not have adopted an overly narrow interpretation of "distribute" and "campaign literature" in LMRDA § 401(c) to account for its concerns with interference with the *Postal Record*. Instead, the district court should have adopted a broad view of the statute and analyzed whether Noble plausibly alleged that his request was "reasonable" under LMRDA § 401(c). *See id.* at 478 ("Section 401(c) simply prescribes a straightforward test: Is the candidate's request reasonable?").

## B. The District Court Erroneously Determined that Noble's Complaint Failed to State a Claim for Relief.

The district court determined that, even if Noble's request fell under LMRDA § 401(c), it was not reasonable. JA000306–309. In doing so, the district court failed to acknowledge Noble's pro se status, failed to construe Noble's complaint liberally in his favor or consider the statements made in Noble's other pleadings and pro se affidavits, held Noble to the same standard as a lawyer, and erroneously found that Noble had failed to state a plausible claim for relief. This Court should reverse.

29

## 1. Standard of Review

This Court reviews *de novo* the district court's dismissal of a complaint under Rule 12(b)(6). *VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*, 992 F.3d 1097, 1104 (D.C. Cir. 2021). Where the district court dismisses a case on the complaint alone, the Court "must for purposes of [an] appeal assume the truth of the factual allegations." *Id.* "A plaintiff need not make detailed factual allegations, but [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The standard requires more than a sheer possibility that a defendant has acted unlawfully but is not akin to a probability requirement." *Id.* (quotations and citations omitted).

"[A] complaint survives a motion to dismiss even [i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible." *Id.* (quotations and citations omitted). In addition, the fact that a plaintiff may face

difficulties in proving his or her case "is not a basis for dismissal of a case under Rule 12(b)(6)." *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 950 (D.C. Cir. 2013). "A court must assess [] the legal feasibility of the complaint, but [may] not weigh the evidence that might be offered to support it." *Id.* (quotations and citations omitted).

"A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In reviewing the sufficiency of a pro se plaintiff's allegations, the Court is not "limited to the complaint itself: [it] may consider [the plaintiff]'s pro se affidavits and exhibits, as well as public records subject to judicial notice." *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).

### 2. The District Court Erroneously Ignored Noble's Status as a Pro Se Litigant.

In dismissing Noble's complaint under Rule 12(b)(6), the district court was required to "liberally construe" Noble's complaint, "however inartfully pleaded," and hold Noble's complaint to "less stringent standards" than formal pleadings drafted by a lawyer. *See Erickson*, 551

31

U.S. at 94. But there is no indication in the record that the district court did so. The district court did not even acknowledge the fact that Noble was acting pro se. Instead, the district court treated Noble's complaint as if it had been filed by a lawyer and dismissed it without even providing Noble with fair notice of the pleading requirements and an opportunity for Noble to amend the complaint. *See generally* JA000296–309. Because there is no indication that NALC would have been prejudiced by allowing Noble leave to amend, or that an amendment would have been futile, this was erroneous. *See Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 877–78 (D.C. Cir. 1993) (reversing dismissal of pro se complaint where the district court failed to inform the plaintiff of the pleading standard and allow leave to amend).

Critically, the district court determined that Noble's request for NALC to distribute his campaign literature was not reasonable, in part, because "Noble has not alleged here that the *Postal Record* is campaign literature in favor of the incumbents such that he should get equal space in the magazine." JA000307. But Noble's complaint suggests the opposite. Noble alleged that "The *Postal Record*, which may be viewed at NALC.org, prominently features the activities of the union's incumbent

officers, against whom Clean Sweep are running in the election."
JA000024. Further, Noble explained in other briefing, along with a pro
se affidavit, that the incumbent officers have full-page columns in the
*Postal Record*, where they exalt their accomplishments and promote
themselves to the membership, and that the magazine includes stories
with photographs of the incumbents and praise for their work. *See*
JA00034–35; JA000068.

If accepted as true and liberally construed, these allegations, taken
together, indicate that NALC incumbents use the *Postal Record* as
campaign literature and that Noble should have been provided with
"similar distribution" (i.e., distribution in the *Postal Record*) "with equal
treatment" (i.e., at NALC's expense) under LMRDA § 401(c). *See, e.g.*,
*Hodgson*, 344 F. Supp. at 36 (after finding that union used a journal as
campaign literature, ordering union to make available "equal space for
the presentation of news concerning, and the political views of bona fide
candidates"); *Yablonski v. United Mine Workers of Am.*, 305 F. Supp. 876,
877 (D.D.C. 1969) (after finding that the union used a journal as
campaign literature, ordering the union to provide candidates with "fair
and comparable treatment," which "was designed to permit the union, if

it so desired, to devote equal space in the Journal to a presentation on a nondiscriminatory basis of news concerning, and the views of, the two candidates, even if the material to be printed were prepared by the candidates themselves").

### 3. Noble Plausibly Alleged that His Request for NALC to Distribute His Campaign Literature Was Reasonable.

The district court ruled that Noble's request was unreasonable as a matter of law because § 401(c) "does not give Noble license to alter the nature of the *Postal Record* by requiring it to print advertising and campaign material it otherwise would not." JA000306–307. But Noble's allegations make clear that the *Postal Record* <u>allows</u> candidates to publish campaign advertisements in "one issue every four years." *See* JA000011. Thus, the issue is not whether the *Postal Record* permits campaign advertising (it does), but whether NALC is permitted to establish a rule that restricts such advertising in the *Postal Record* to a single issue every four years, when the incumbents are permitted to use the *Postal Record* as a platform in every issue.

The Supreme Court's decision in *Brown* makes clear that NALC cannot use such a rule to prohibit a candidate's reasonable request to

distribute campaign literature. *See* 498 U.S. at 475 ("The language of the statute plainly requires unions to comply with 'all reasonable requests,' and just as plainly does *not* require union members to comply with 'all reasonable rules' when making such requests.") (emphasis in original). Indeed, Noble's request was not "*per se* unreasonable simply because it conflicts with a union rule." *See id.* at 478. The *Brown* court made clear that the reasonableness question turns on several factors, including whether the request "caused administrative or financial hardship to the Union" or whether "it discriminated against any other candidate." 498 U.S. at 475. None of these factors were even considered by the district court. And, tellingly, NALC did not make any showing that any of these factors were present.

Instead, the district court found that Noble's request was unreasonable based on "two *other* provisions of the LMRDA under which courts generally refuse to interfere with union publications." JA000307 (emphasis added). The first of those provisions is § 401(c)'s "similar distribution … with equal treatment" provision. *See id.* But, contrary to the district court's statement, courts have required unions to make space available in their publications for the views of other bona fide candidates

35

where, as here, that publication is used by the incumbents as "campaign literature." *See, e.g.*, *Hodges*, 344 F. Supp. at 36; *Yablonski*, 305 F. Supp. at 877.[6]

The second provision is LMRDA § 101—the free speech provision. But, as the Supreme Court recognized in *Brown*, a member's speech and voting rights in LMRDA § 101 "are made 'subject to reasonable rules' in the union constitution.'" 498 U.S. at 475–76. LMRDA § 401(c) is not. Further, courts have required unions to publish competing views in their publications under LMRDA § 101 in certain circumstances. The Sixth Circuit has repeatedly held that, where a union distributes a newsletter that is an "open forum" for the discussion of union issues, the union cannot unreasonably refuse to allow members access to that forum based solely upon the content of their expression. *See Shimman v. Miller*, 995 F.2d 651, 654–55 (6th Cir. 1993); *Knox County*, 720 F.2d at 939–41.

NALC made the *Postal Record* an open forum by allowing members to run advertisements for job transfers, by allowing incumbents to

---

[6] The court in *Yablonski* also gave the union the alternative of being "fair and impartial in its reporting of the activities of the candidates." 305 F. Supp. at 878. Thus, the union had to either be "fair and impartial" or provide other candidates with "fair and comparable treatment." *See id.* at 877–78.

promote themselves in full-page columns in every issue, and by running articles that promote the incumbents. *See* JA000024–25; JA00034–35; JA000068. NALC was not permitted to refuse publication of Noble's campaign advertisement simply because the *content* of his advertisement was different.

In any event, neither of these provisions necessarily controls the question of whether Noble's request was reasonable under LMRDA § 401(c). Because nothing on the face of Noble's complaint demonstrates that Noble's request would "cause[] administrative or financial hardship to" NALC or "discriminate[] against any other candidate," the district court should not have dismissed Noble's claim against NALC. *See Brown*, 498 U.S. at 475.

## <u>CONCLUSION</u>

For the foregoing reasons, Noble respectfully requests that the Court reverse the district court's dismissal of Noble's claim against NALC and remand for further proceedings.

Dated: May 15, 2023                    Respectfully submitted,

                                        */s/ Daniel F. Olejko*
                                       Daniel F. Olejko
                                       D.C. Circuit Bar No. 64141
                                       BRAGALONE OLEJKO SAAD PC
                                       901 Main St., Ste. 3800
                                       Dallas, Texas 75202
                                       214-785-6670
                                       214-785-6680
                                       dolejko@bosfirm.com

                                       *Counsel for Appellant*
                                       *David W. Noble, Jr.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   X    The brief contains 7,155 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

      The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

   X    The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in a 14-point Century Schoolbook font or

      The brief has been prepared in a monospaced typeface using _____ in a ___ characters per inch _____ font.

Dated: May 15, 2023

*/s/ Daniel F. Olejko*
Daniel F. Olejko
D.C. Circuit Bar No. 64141
BRAGALONE OLEJKO SAAD PC

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Daniel F. Olejko*
Daniel F. Olejko
D.C. Circuit Bar No. 64141
BRAGALONE OLEJKO SAAD PC

*Counsel for Appellant*
*David W. Noble, Jr.*
