# 23-7012

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAVID W. NOBLE, JR.,

*Plaintiff-Appellant,*

*v.*

NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO, *et al*.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 22-cv-01613-DLF
The Honorable Dabney L. Friedrich

## BRIEF OF DEFENDANTS-APPELLEES

Peter D. DeChiara
Cohen, Weiss and Simon LLP
900 Third Avenue, Suite 2100
New York, NY 10022-4869
(212) 563-4100
pdechiara@cwsny.com

*Attorneys for Defendants-Appellees*
*National Association of Letter Carriers,*
*AFL-CIO and NALC Branches 9 and 421*

## <u>CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES</u>

A.    <u>Parties and Amici</u>:

The parties before the district court were:

Plaintiff:
David W. Noble ("Noble")

Defendants:
National Association of Letter Carriers, AFL-CIO ("NALC")
NALC Branch 9 ("Branch 9")
NALC Branch 421("Branch 421")

The same parties are before this Court.

There were no amici or intervenors in the district court and there are none in

this Court.

B.    <u>Rulings Under Review</u>:

The ruling under review in this Court is the December 13, 2022

Memorandum Opinion of United States District Judge Dabney L. Friedrich.   The

decision appears in the appendix at JA000297-309.  The ruling is reported on

Westlaw at 2022 WL 17613057.

C.    <u>Related Cases</u>:

This case was not previously before this Court or any other court.  As

far as counsel is aware, there are no related cases pending in this Court or in any

other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, NALC states that it is a labor organization that serves as the exclusive collective bargaining representative of a nationwide bargaining unit of city letter carriers employed by the United States Postal Service ("USPS").  Branches 9 and 421 are local labor organizations affiliated with NALC that administer at the local level the collective bargaining agreement between USPS and NALC.  All three Defendants-Appellees are unincorporated associations whose membership includes those currently employed as city letter carriers and those retired from employment as city letter carriers.  They have no parent companies and no publicly-held company has any ownership interest in them.  None of the members of the three Defendants-Appellees, in their capacity as members, have issued shares or debt securities to the public.

# TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES ..................... i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

ISSUES PRESENTED FOR REVIEW ................................................... 1

STATEMENT OF THE CASE ............................................................... 1

      Noble's Complaint ........................................................................ 3

      The District Court's Decision ....................................................... 5

SUMMARY OF ARGUMENT ............................................................. 6

ARGUMENT .................................................................................... 7

I.    SECTION 401(c) DOES NOT COMPEL A UNION TO PUBLISH
    A CANDIDATE'S CAMPAIGN ADVERTISEMENTS ............................. 7

      A.    Section 401(c) Cannot Be Read to Conflict with The First
           Amendment's Prohibition on Compelled Speech ............................... 7

      B.    Both Courts and the DOL Have Construed Section 401(c)
           As Containing No Publication Requirement ..................................... 10

      C.    The Text of Section 401(c) Contains No Publication
           Requirement ..................................................................... 12

      D.    The District Court's Reading of Section 401(c) Was Not Overly
           Narrow .......................................................................... 17

      E.    The Sixth Circuit's "Open Forum" Cases Have No Relevance
           Here ............................................................................. 19

II.    THE DISTRICT COURT CORRECTLY HELD THAT NOBLE'S
    REQUEST WAS NOT REASONABLE ..................................................... 21

III.    NOBLE DID NOT STATE A CLAIM THAT THE *POSTAL
    RECORD* CONSTITUTED CAMPAIGN LITERATURE ......................... 24

IV.    THE DISTRICT COURT DID NOT ERR BY DISMISSING
      NOBLE'S CLAIM WITH PREJUDICE ....................................................... 29

CONCLUSION ..................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bliss v. Holmes*,
721 F.2d 156 (6th Cir. 1983) ............................................................16

*Blumenthal v. Drudge*,
992 F.Supp. 44 (D.D.C. 1998) ..........................................................14

*Brady v. Assoc. Press Telecom*,
16-CV-2693(GBD)(KNF), 2016 WL 11272153 (S.D.N.Y. Oct. 4, 2016) ..........8

*Camarata v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*
*Helpers of Am.*, 478 F.Supp. 321 (D.D.C. 1979).......................................9, 10, 18

*Dimondstein v. Am. Postal Workers Union*,
964 F.Supp.2d 37 (D.D.C. 2013) .................................................11, 15

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.*
*Trades Council*, 485 U.S. 568 (1988) ...................................................7

*Guzman v. Local 32B-32J, SEIU*,
151 F.3d 86 (2d Cir. 1998) ...............................................................16

*Hodgson v. United Mine Workers of Am.*,
344 F.Supp. 17 (D.D.C. 1972) ....................................................11, 12

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995)...........................................................................7

*Int'l Org. of Masters, Mates & Pilots v. Brown*,
498 U.S. 466 (1991)...................................................................18, 19

*Knox County Local, Nat'l Rural Letter Carriers' Ass'n v. Nat'l Rural*
*Letter Carriers' Ass'n*, 720 F.2d 936 (6th Cir. 1984) ........................20

*Lerman v. Chuckleberry Pub., Inc.*,
521 F.Supp. 228 (S.D.N.Y. 1981) ....................................................15

*McBride v. Merrell Dow & Pharms., Inc.*,
613 F.Supp. 1349 (D.D.C. 1985)......................................................14

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974).................................................................................7

*Miss. Gay All. v. Goudelock*,
   536 F.2d 1073 (5th Cir. 1976) ..............................................................8

*Nat'l Ass'n of Mfrs. v. NLRB*,
   717 F.3d 947 (D.C. Cir. 2013)...............................................................7

*Noble v. Dunn*,
   895 F.3d 807 (D.C. Cir. 2018)................................................................2

*Noble v. NALC*,
   285 F.Supp.3d 128 (D.D.C. 2018)..........................................................2

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*,
   475 U.S. 1 (1986)....................................................................................8

*Passaic Daily News v. NLRB*,
   736 F.2d 1543 (D.C. Cir. 1984)......................................................8, 9, 12, 18

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
   413 U.S. 376 (1973)...............................................................................14

*Shelley v. Am. Postal Workers Union*,
   775 F.Supp.2d 197 (D.D.C. 2011).........................................................18

*Shimman v. Miller*,
   995 F.2d 651 (6th Cir. 1993) ................................................................20

*Usery v. Int'l Org. of Masters, Mates & Pilots*,
   538 F.2d 946 (2d Cir. 1976) .................................................................16

*Washington Post v. McManus*,
   355 F.Supp.3d 272 (D. Md. 2019).........................................................8

*Yablonski v. United Mine Workers*,
   305 F.Supp. 876 (D.D.C. 1969) (cited at Noble Br. 33-34) ...............10

*Yablonski v. United Mine Workers of Am.*,
   305 F.Supp. 868 (D.D.C. 1969)........................................................9, 10

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court correctly dismissed with prejudice Noble's claim against NALC under Section 401(c) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §481(c), on the ground that NALC had no obligation under Section 401(c) to publish Noble's campaign advertisements in its magazine.

2.      Whether it was error for the district court not to hold that Noble had a viable claim under Section 401(c) based on the theory that NALC's magazine constituted campaign literature by the incumbent union officers, when Noble never asserted such a claim and when examination of the magazine defeats such a claim.

## STATEMENT OF THE CASE

Section 401(c) of the LMRDA requires unions to comply with "reasonable requests" by candidates for union office "to distribute by mail or otherwise at the candidate's expense literature in aid of such person's candidacy."  29 U.S.C. §481(c).  Since Congress enacted the LMRDA in 1959, no court has *ever* construed this language as forcing a union to publish candidate content in its magazine or newsletter.  Moreover, the United States Department of Labor ("DOL") has rejected that contention.

Section 401(c) provides candidates for union office a mechanism for getting their message out to the union membership.  Because the union has an address list

of its members, and the candidates generally do not, Section 401(c) requires the union to take the candidate's campaign literature and distribute it, at the candidate's expense, to the membership. The statute promotes union democracy – not by forcing the union to include the candidate's content in its publication – but by giving candidates a means, via the union, of getting their literature into the hands of the members.

Noble has run repeatedly for the presidency of NALC, and each time the voters have resoundingly rejected his bid. He has also failed in litigation. He spent over twenty-three years trying to establish that NALC's leadership was corrupt, but this Court in the end found that he "failed to adduce any evidence of wrongdoing by the defendants." *Noble v. Dunn*, 895 F.3d 807, 813 (D.C. Cir. 2018). He also sued unsuccessfully to block NALC's membership from voting on a negotiated collective bargaining agreement, an agreement later overwhelmingly ratified by a vote of 78,935 to 4,732. *See Noble v. NALC*, 285 F.Supp.3d 128, 131 (D.D.C. 2018).

Noble now urges this Court to adopt an unprecedented construction of Section 401(c) that would compel NALC to publish his campaign advertisements virtually whenever he chooses. As explained below, his claim runs counter to the text and purpose of the statute, Section 401(c) case law, and the views of the DOL.

It also runs counter to the fundamental First Amendment prohibition on compelled speech.

In the alternative, Noble argues that the district court should have held that Section 401(c) required NALC to publish his campaign advertisements because, he now asserts, NALC's magazine constituted campaign literature by its incumbent union officers. The district court did not err in not so holding, both because Noble never asserted such a claim below and because examination of NALC's magazine defeats such a claim.

For all these reasons, as explained more fully below, the Court should affirm the district court's dismissal of Noble's suit.

Noble's Complaint

According to his amended complaint, Noble is a NALC member who ran as a candidate for union president in NALC's officer elections held in fall 2022. JA000023 (¶¶3, 5).

As Noble alleged, the *Postal Record* is NALC's monthly magazine, which it uses to communicate with the membership. JA000023 (¶1). As set out in more detail below, *see infra* pp. 27-28, the magazine contains an anodyne mix of articles about letter carriers, the union and USPS. There are regular reports from or about groups within the union, like state associations, local branches and the union's retirement community. A fraction of the publication contains monthly columns by

the union's national officers, columns mostly devoted to providing news or useful information to the union's local officers and members.  None of the articles or columns in the *Postal Record* discusses officer elections, any member's candidacy, or any candidate's suitability for office.

NALC allows no advertisements in the *Postal Record*, with two exceptions. It allows members to place advertisements for "mutual transfers," in which one letter carrier seeks to swap assignments with a letter carrier assigned elsewhere. JA000025 (¶14).  For example, the nine "mutual transfer" advertisements in the June 2022 issue included one by a letter carrier in Minnesota seeking to change positions with a letter carrier in Florida.  JA000165

In addition, once every four years, NALC allows candidates to place paid campaign advertisements in the "election" issue of the *Postal Record* that appears before ballots are mailed to the membership.  JA000011.  For the fall 2022 NALC officer elections, the "election" issue was the September/October 2022 issue. JA000126.

On December 18, 2021, Noble sent NALC an email stating, "I want to begin running political ads in the Postal Record beginning with the February issue. Please tell me the per-page cost and the monthly deadline."  JA000039.  NALC's counsel responded on December 29, 2021:

> In accordance with longstanding NALC policy, NALC
> does not run political ads in the *Postal Record*, with the

> exception of one issue every four years, preceding the
> NALC national officer elections.  The rates and deadline
> for political ads for that issue have not yet been
> determined.  NALC plans to announce the rates and
> deadline in the June 2022 issue of the *Postal Record*.

*Id*.

In his one-count amended complaint, Noble claimed that by denying his request that it publish his campaign advertisement in the February 2022 issue of the *Postal Record*, NALC "violated section 401(c) of the LMRDA."  JA000025 (¶17).  He also claimed that Branches 9 and 421 violated Section 401(c) by denying his requests that they publish his campaign advertisements in their publications.  *Id*.

The District Court's Decision

On December 13, 2022, the district court dismissed Noble's claim against NALC with prejudice.  JA000296.  Judge Friedrich held that Noble's request that NALC publish his campaign advertisements in the *Postal Record* did not constitute a request that it "distribute" his "campaign literature" within the meaning of Section 401(c).  JA000306.  The court interpreted Section 401(c) as only requiring unions to "coordinate the delivery of a candidate's standalone, already-printed material."  *Id*.  The district court also held that Noble's request was not "reasonable" within the meaning of Section 401(c), explaining that the statute

"does not give Noble license to alter the nature of the *Postal Record* by requiring it to print advertising and campaign material it otherwise would not."  JA000306-07.

The district court dismissed Noble's claims against Branches 9 and 421 on venue grounds, since neither had an office in the District of Columbia.  JA000304-305.  Noble's appeal does not challenge the court's venue ruling, leaving his claim against NALC as the only claim at issue in this appeal.

## SUMMARY OF ARGUMENT

The district court properly dismissed Noble's Section 401(c) claim with prejudice since the statute contains no requirement that a union publish a candidate's campaign advertisements.  The statute requires only that a union, upon request, "distribute" a candidate's campaign "literature," meaning that it must take the candidate's letters, fliers, brochures or other stand-alone documents and give them out to the union's members.  No court has ever held that Section 401(c) requires a union to publish a candidate's campaign advertisements.  The DOL has also rejected the idea.  Moreover, requiring a union to publish candidate content would run afoul of the First Amendment's prohibition on compelled speech.

Similarly meritless is Noble's alternative claim, that NALC had an obligation to publish his campaign advertisements because the *Postal Record* supposedly constitutes campaign literature on behalf of NALC's incumbent officers.  Noble never asserted such a claim below.  Even if he had, the claim

6

would have failed since he nowhere alleges facts showing that the *Postal Record* is campaign literature, and an examination of the magazine shows that it is not.

## ARGUMENT:

## I.    SECTION 401(c) DOES NOT COMPEL A UNION TO PUBLISH A CANDIDATE'S CAMPAIGN ADVERTISEMENTS

### A.    Section 401(c) Cannot Be Read to Conflict with The First Amendment's Prohibition on Compelled Speech

Before turning to Section 401(c), we begin with the fundamental constitutional principle that must necessarily inform any reading of the statute and that precludes the relief Noble seeks:  the First Amendment right "against compelled speech."  *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 957 (D.C. Cir. 2013); *see generally Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (construing federal labor statute as permitting union's conduct, when doing otherwise would "pose serious questions of the validity of the [statute] under the First Amendment").

Under the First Amendment, a publisher cannot be compelled to print content that it chooses not to print, even when the content is authored by someone else.  *See, e.g., Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (statute requiring newspaper to publish candidate's content violates First Amendment); *see also Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995) ("[E]ven the simple selection of a paid noncommercial advertisement for inclusion in a daily paper … fall[s] squarely

within the core of First Amendment security….").  This constitutional right not to publish third-party content applies not just to newspapers but also to in-house publications by non-media entities.  *See, e.g., Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*, 475 U.S. 1, 12 (1986) (violation of First Amendment to order private utility company to include in its newsletter content prepared by third party).

The lower courts have repeatedly affirmed this right not to publish the content of others, including advertisements.  *See, e.g., Miss. Gay All. v. Goudelock*, 536 F.2d 1073, 1075 (5th Cir. 1976) (rejecting suit seeking to require newspaper to publish advertisement, since the First Amendment "interdicts judicial interference" with decision on what to print); *Washington Post v. McManus*, 355 F.Supp.3d 272, 299-300 (D. Md. 2019) (enjoining state statute that would have required online publishers to post state-mandated information on their websites); *Brady v. Assoc. Press Telecom*, 16-CV-2693(GBD)(KNF), 2016 WL 11272153, at \*5 (S.D.N.Y. Oct. 4, 2016) ("compelling the defendants to publish what they prefer to withhold would run afoul of the defendants' First Amendment rights").

In *Passaic Daily News v. NLRB*, 736 F.2d 1543 (D.C. Cir. 1984), this Court upheld the NLRB's finding that a newspaper had unlawfully fired a journalist for union activity, but refused to enforce that part of the NLRB's remedial order requiring the newspaper to resume printing the journalist's newspaper columns. The Court explained that "to compel the Company to publish what it prefers to

withhold," would run afoul of the publisher's "absolute discretion" to determine the content of its newspaper. *Id*. at 1557.

Consistent with these cases, the district court in this Circuit has, on two prior occasions, recognized that the First Amendment blocks any effort to compel a union to publish a candidate's content. In *Camarata v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 478 F. Supp. 321, 331 (D.D.C. 1979), candidates for union office requested, as a remedy for the union's alleged Section 401(c) violation, the publication of their campaign material in the union's publication. The court held that such relief "would infringe upon the union's First Amendment rights." *Id*. In *Yablonski v. United Mine Workers of Am.*, 305 F.Supp. 868, 875 (D.D.C. 1969), the court denied a preliminary injunction sought by a candidate for union office to the extent the candidate sought to require the union to print certain material in the union's publication. The court explained that "to tell the [union publication] what it can and cannot print," *id.* at 871, would be "in clear violation of the First Amendment's guarantee of freedom of the press." *Id*. at 875.

In sum, the First Amendment precludes the relief Noble seeks, by prohibiting any construction of Section 401(c) that would require a union to publish a candidate's campaign advertisements. Fortunately, the Court need not grapple with any constitutional issues here, because no plausible reading of Section 401(c) imposes a publication requirement.

9

### B.    Both Courts and the DOL Have Construed Section 401(c) As Containing No Publication Requirement

The district court was clearly correct in holding that Section 401(c) did not obligate NALC to publish Noble's campaign advertisements. Despite the countless union officer elections that have occurred in the sixty plus years since enactment of the LMRDA, no court has *ever* construed Section 401(c) as requiring a union to publish a candidate's campaign advertisements. Noble certainly cites no such case. Nor does he cite any legislative history showing that Congress intended Section 401(c) to contain a publication requirement.

Those courts that have considered the issue have rejected the claim that the statute requires publication of candidate content. In *Yablonski*, the district court held that Section 401(c) "does not authorize this type of relief" and so "is beyond our statutory authority to grant." 305 F.Supp. at 872.[1] The same court repeated that conclusion in *Camarata*, finding that requiring inclusion of the candidates' material in the union's publication "is beyond the authority of this court to grant." 478 F.Supp. at 331.

---

[1] Noble cites the *Yablonski* court's later clarification of its order. *See Yablonski v. United Mine Workers*, 305 F. Supp. 876 (D.D.C. 1969) (cited at Noble Br. 33-34). That clarification reaffirmed the court's determination that it lacked authority to compel the union to provide a candidate space in its publication, explaining only that the union could do so "if it so desired." *Id.* at 877.

Moreover, the DOL has already rejected the claim that Noble makes here. After losing his bid for the presidency in NALC's 2018 elections, Noble claimed that the union had acted unlawfully by denying his request to place campaign advertisements in issues of the *Postal Record* that preceded the quadrennial "election" issue. JA000052. If Section 401(c) gave Noble the right to place campaign advertisements in the *Postal Record*, the DOL would have sustained his election objection. By finding NALC committed "no violation," JA000053, the DOL necessarily read Section 401(c) as providing no such right. Because the DOL is the agency charged with administering the LMRDA, it provides expert guidance on the meaning of the statute. *See Dimondstein v. Am. Postal Workers Union*, 964 F.Supp.2d 37, 42-43 (D.D.C. 2013) (relying on DOL for guidance on interpretation of Section 401(c)). The DOL's ruling is particularly persuasive here since it aligns with the Section 401(c) court decisions cited above.[2]

*Hodgson v. United Mine Workers of Am.*, 344 F. Supp. 17 (D.D.C. 1972) (cited at Noble Br. 33) provides Noble no support. In *Hodgson*, the court nullified the results of a tainted union election and ordered the election re-run under the

---

[2] In May 2023, the DOL issued a notice that it had rejected Noble's challenge to NALC's 2022 election, a challenge in which Noble again asserted that NALC violated Section 401(c) by denying his request that it publish his campaign advertisements in the *Postal Record* prior to the "election" issue. The DOL has not yet issued an opinion explaining its determination, but once it does, NALC will seek to include it in the record before this Court.

DOL's supervision. *See* 344 F. Supp. at 35. As part of the relief it fashioned to address the union's prior violations, the court ordered that, for a limited period preceding the supervised re-run, the union's journal was to provide candidates equal space to express their views. *See id.* at 36. *Hodgson* thus required a union to open its journal to candidates not as a matter of right under Section 401(c), but only as a remedy for the union's prior violations of federal law and only for the period preceding the government-supervised re-run.[3]

### C.    The Text of Section 401(c) Contains No Publication Requirement

If Congress intended Section 401(c) to require a union to publish candidate content, it could have easily said so in the text of the statute. It did not. The goal of Section 401(c) was not to impose an unconstitutional publication obligation on unions. Rather, Congress aimed to promote union democracy by allowing candidates to deliver their message directly to the union members. The problem was that candidates typically do not have access to the union's list of member names and addresses. To solve that problem, Congress in Section 401(c) required unions, upon a candidate's request and at the candidate's expense, to distribute the candidate's campaign literature to the membership. That is exactly what the text of

---

[3] Even such a limited remedy would be of dubious constitutionality today, in light of this Court's subsequent ruling in *Passaic Daily News*, which held that the First Amendment prohibits compelled speech even when intended to remedy prior unlawful conduct. *See* 736 F.2d at 1557.

Section 401(c) says:  that a union must "comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature."

To "distribute" means to "deal out," "give out" or "hand out."  *See* JA000305-306 (district court quoting WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 2d ed. (1958) as defining "distribute" to mean to "deal out"); *see also* MERRIAM-WEBSTER DICTIONARY (defining "distribute" as "to give out or deliver especially to members of a group"; providing as an example "distribute leaflets") (italics omitted); CAMBRIDGE ENGLISH DICTIONARY (defining "distribute" as "to give something out to several people"; providing as an example "distributing … leaflets/pamphlets") (italics omitted); COLLINS (defining "distribute" as to "hand out").[4]

Dictionaries define "literature" to mean "printed matter of any kind," giving as examples standalone, already-printed materials such as leaflets, handbills, circulars and brochures.  JA000306 (citing dictionaries); *see also* MERRIAM-

---

[4] *Distribute*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/distribute; *Distribute*, CAMBRIDGE ENGLISH DICTIONARY, https://dictionary.cambridge.org/dictionary/english/distribute; *Distribute*, COLLINS, https://www.collinsdictionary.com/us/dictionary/english-thesaurus/distribute (last visited May 31, 2023).

WEBSTER DICTIONARY (defining "literature" as "printed matter (such as leaflets or circulars)"); COLLINS (defining "literature" as "printed matter on any subject").[5]

Thus, as the district court explained, when read together as one phrase, "distribute … campaign literature" in Section 401(c) means giving out already existing pieces of stand-alone campaign material.  JA000306.

The distinction between distributing stand-alone documents and publishing content is not just a question of semantics.  The distinction carries legal significance, because the latter is expressive conduct, while the former is not.  As discussed above, constitutional protections attach to the publication of content.  Even beyond constitutional considerations, the law views the two as distinct, and applies different standards to them.  For example, a publisher of a newspaper or magazine can be liable for publishing defamatory material written by others.  *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 386 (1973); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998).  By contrast, absent special circumstances, someone who simply distributes the material, such as newsstand vendor, cannot be liable.  *See McBride v. Merrell Dow & Pharms., Inc.*, 613 F. Supp. 1349, 1356–57 (D.D.C. 1985), *aff'd in part, rev'd in part on other*

---

[5] *Literature*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/literature; *Literature*, COLLINS, https://www.collinsdictionary.com/us/dictionary/english-thesaurus/literature (last visited May 31, 2023).

*grounds*, 800 F.2d 1208 (D.C. Cir. 1986); *see also Lerman v. Chuckleberry Pub., Inc.*, 521 F. Supp. 228, 235–36 (S.D.N.Y. 1981), *rev'd on other grounds*, 745 F.2d 123 (2d Cir. 1984).

Indeed, DOL regulations under Section 401(c) do not even allow a union to insist on reading a candidate's literature before distributing it.  *See* 29 C.F.R. §452.70.  It is hard to imagine that a union could not insist on reading content if it was required to publish it.

Noble points out that Section 401(c) requires a union to distribute candidate campaign literature "by mail *or otherwise*," 29 U.S.C. §481(c) (emphasis added), and argues that the "or otherwise" language would be a nullity unless interpreted to mean the publication of campaign advertisements.  Noble Br. 22-23.  This argument fails because there are non-mail methods of distribution of candidate literature.  For example, unions can distribute candidate campaign literature by hand to attendees at union membership meetings or give out the material to members at their workplaces.  Moreover, as Congress could foresee in 1959 when it used the phrase "mail or otherwise," technology can give rise to new non-mail methods of distribution.  For example, the phrase "or otherwise" has now been recognized to encompass distribution by email.  *See Dimondstein*, 964 F.Supp.2d at 42-43.  The phrase "or otherwise" need not, and does not, include publication.

Noble next argues that the district court construed the term "literature" too narrowly by restricting it to stand-alone documents. Noble Br. 24, 26. But in the cases Noble cites, the campaign literature consisted of stand-alone writings. For example, in *Guzman v. Local 32B-32J, SEIU,* 151 F.3d 86, 91 (2d Cir. 1998), the union published a 142-page book that provided excessive coverage of the incumbent union president. The court found that "*the publication* was campaign literature," *id.* at 91 (emphasis added), referring to the entire stand-alone book. Not every word in the book promoted the union president, *id.* at 91, but enough did to convert the entire work into a single piece of campaign literature. The union newsletters in the other cases Noble cites were also stand-alone writings not part of a larger publication. *See Bliss v. Holmes*, 721 F.2d 156, 158-59 (6th Cir. 1983); *Usery v. Int'l Org. of Masters, Mates & Pilots*, 538 F.2d 946, 949 (2d Cir. 1976).

Noble next argues that campaign literature need not be on paper, but can be electronic. Noble Br. 25. That is true, but does not prove that the term "literature" in Section 401(c) includes content contained in a larger publication. Certainly, campaign literature can be digitized and delivered by electronic means, such as email, without being part of a larger publication.

Noble notes that dictionary definitions cited by the district court give "advertising" as examples of "literature." Noble Br. 25 (citing JA000306). Pieces of literature, like fliers or leaflets, certainly can be used for the purpose of

advertising.  The point, however, is that advertising content is only commonly considered "literature" if in a separate, stand-alone document.

Noble cites to the District of Columbia's municipal regulations – an authority with no apparent relevance to this case -- to show that the term "campaign literature" can include advertisements published in another publication. Noble Br 26 & n.5.  In fact, the regulations show no such thing.  The regulations Noble cites do not define "campaign literature"; they define instead the term "political advertising."  3 D.C.M.R. §3018.5.

 As to the meaning of "distribute," Noble points out that the word can refer to the distribution of magazines or other publications.  Noble Br. 23-24.  That is true, but irrelevant.  Noble did not ask NALC to distribute a magazine or other publication.  Rather, he asked NALC to publish his campaign advertisement *in NALC's magazine*.

In sum, as the district court correctly held, the text of Section 401(c) refers to a union giving out a candidate's stand-alone writings, not publishing the candidate's advertisements in its journal.

### D.    The District Court's Reading of Section 401(c) Was Not Overly Narrow

Contrary to Noble's claim, Noble Br. 22, the district court's reading of Section 401(c) was not too narrow.  First, as explained above, to read Section 401(c) to require a union to publish a candidate's campaign advertisements would

stretch the terms "literature" and "distribute" beyond their common meanings, and also infringe a union's "absolute discretion" under the First Amendment, *Passaic Daily News*, 736 F.2d at 1557, to decide the contents of its publication.  Moreover, for a court to read Section 401(c) to require a union to open the pages of its journal to unlimited candidate advertisements would undermine the "long-standing policy of avoiding judicial interference in a union's self-governance and internal affairs." *Shelley v. Am. Postal Workers Union*, 775 F.Supp.2d 197, 207 (D.D.C. 2011); *see also Camarata*, 478 F. Supp. at 330 (noting "congressional intent to minimize judicial interference in union elections").

In arguing that the district court read Section 401(c) too narrowly, Noble relies on *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991). Noble Br. 24.  *Brown*, however, merely held that a union may not restrict a candidate's Section 401(c) distribution right with a rule that it would only make distributions after the union's nominating convention.  *See id.* at 477.  *Brown* nowhere even hints that Section 401(c) gives candidates the right to force a union to include their campaign advertisements in the union's magazine.

Indeed, *Brown* supports the district court's ruling.  By recognizing that the LMRDA demands a "broad interpretation of the candidate's right to distribute literature *commenting on the positions advocated in the union press*," *id.* at 476 (emphasis added), the Court saw Section 401(c) as a mechanism for giving

candidates a means of communicating their views *other* than through the union magazine.  Section 401(c) was meant to promote union democracy by providing candidates a counterweight to the union's press, not by letting them pry open the pages of the union's publication.

Noble also points out that *Brown* described Section 401(c) as providing an "unqualified" right, in contrast to the rights in LMRDA Sections 101(a)(1) and 101(a)(2), 29 U.S.C. §§411(a)(1), (a)(2), which are subject to a union's "reasonable rules."  Noble Br. 27, 36.  While unions may not make rules limiting candidates' Section 401(c) rights, candidates still only have the rights that Section 401(c) gives them.  For all the reasons explained above, that does not include compelling publication of their campaign advertisements.

### E.    The Sixth Circuit's "Open Forum" Cases Have No Relevance Here

Relying on two Sixth Circuit cases, Noble argues that NALC had an obligation to publish his campaign advertisements because, he claims, the *Postal Record* is an "open forum."  Noble Br. 36 (citing *Shimman v. Miller*, 995 F.2d 651 (6th Cir. 1993); *Knox County Local, Nat'l Rural Letter Carriers' Ass'n v. Nat'l Rural Letter Carriers' Ass'n*, 720 F.2d 936 (6th Cir. 1984)).

This argument fails first because the Sixth Circuit did not decide those cases under Section 401(c).  Neither case involved candidates or campaign literature.  Rather, the two cases turned on interpretations of an entirely different provision of

19

the LMRDA, Section 101(a)(1), 29 U.S.C. §411(a)(1). *See Shimman*, 995 F.2d at
652-53; *Knox*, 720 F.2d at 937-38. Because Noble's pleading very specifically
alleges only a violation of Section 401(c), *see* JA000025 (¶¶16-17), these two
cases have no relevance here.

The two cases are also factually distinguishable. In *Knox*, the court held that
Section 101(a)(1) required a union to print in its magazine an advertisement that
took a position on an internal union debate contrary to that urged in the magazine
by the union's leadership, when the union had turned its magazine into an "open
forum," by allowing members and outside merchants to place advertisements in it,
with no guidelines limiting the quantity or content of those advertisements. 720
F.2d at 937, 940. In *Shimman*, the court found that "under the unique facts" of that
case, that the union could not refuse to print a member's letter to the editor
responding to an article in its newsletter on a disputed matter, when the union had
made its newsletter an "'open forum' for the discussion of union issues." 995 F.2d
at 655.

Here, by contrast, Noble alleges no facts showing that NALC made the
*Postal Record* into an "open forum." The *Postal Records* allows no
advertisements, with the narrow exception of "mutual transfer" advertisements, *see*
JA000025 (¶14), and candidate advertisements in the quadrennial "election" issue,
*see* JA000011; Noble Br. 15. Moreover, Noble alleges no facts showing that

NALC's leadership used the *Postal Record* to advocate for one side of an internal union debate while depriving him an opportunity to express a contrary view.[6]

## II. THE DISTRICT COURT CORRECTLY HELD THAT NOBLE'S REQUEST WAS NOT REASONABLE

The district court held that even if Noble's request could be considered one for distribution of campaign literature within the meaning of Section 401(c), he still failed to state a claim, since his request was not "reasonable" within the meaning of the statute. JA000306; *see, e.g.,* 29 U.S.C. §481(c) (candidate distribution requests must be "reasonable"). As the district court explained, requiring NALC to grant Noble's request "would alter the nature of the *Postal Record* by requiring it to print advertising and campaign material it otherwise would not." JA000307.

Noble argues that his request was reasonable because publishing his campaign advertisement would not have caused NALC administrative or financial hardship or discriminated against any other candidate. Noble Br. 37 (citing *Brown,* 498 U.S. at 475). He notes also that the *Postal Record* already accepts candidate campaign advertisements, in its quadrennial "election" issue. *Id.* at 34.

---

[6] The two Sixth Circuit cases, never endorsed by this Circuit, are also of dubious validity, since they require the publication of content in stark violation of the First Amendment right against compelled speech.

21

Noble's argument misses the point.  As the publisher of the *Postal Record*, NALC has "absolute discretion" under the First Amendment, *Passaic Daily News*, 736 F.2d at 1557, to decide whether to publish advertising in all issues, some issues or no issues.  *See NetChoice, LLC v. Att'y Gen. Fla.*, 34 F.4[th] 1196, 1218 (11th Cir. 2022) (private entity has the fundamental right to decide "to what extent" to disseminate third-party created content).  Noble's request was unreasonable because it sought to infringe NALC's "absolute discretion" to determine when to print candidate campaign advertisements.

Noble's request was also unreasonable because, if granted, it would have required NALC to publish not only his campaign advertisements but also advertisements by any other NALC members who choose to seek union office.  *See* 29 U.S.C. §481(c) (requiring "similar distribution" of campaign literature by any candidate who requests it).  Since NALC has over two hundred thousand members, *see* Noble Br. 14, such candidate advertisements could be virtually unlimited in number and flood the pages of the *Postal Record*, entirely changing its tone and content, with political disputation elbowing out information and feature articles.

As the Supreme Court recognized in *Brown*, the union's elected leadership exercises "control" over the union's publication.  498 U.S. at 476.  That control is entirely proper.  "The duly elected officers of a union have a right and a

22

responsibility to lead," and "to use the union publications to express their views." *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1282 (2d Cir. 1974); *Camarata*, 478 F. Supp. at 330 ("elected union officials are entitled to use union publications to express their views"). The elected leadership's ability to determine what goes into the union's publication is not anti-democratic. To the contrary, it is as consistent with union democracy as the leadership's control over whom the union hires to conduct the union's affairs. *See Finnegan v. Leu*, 456 U.S. 431, 441 ("the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election").

By opening the door to a flood of political advertisements, Noble's request would have the effect of wresting control over the tone and content of the union's publication from its elected leadership. For that reason, too, his request was unreasonable. *See Messina v. Local 1199 SEIU, Nat'l Health & Hum. Serv. Employee Union*, 205 F.Supp.2d 111, 124 (S.D.N.Y. 2002) ("… Congress surely did not intend to create a right, enforceable by the courts, of every union member to publish her views on union governance in the union newspaper.").

Indeed, as the district court noted, by potentially filling the *Postal Record* with advertisements hyping the claims of those vying for office, Noble's request, if granted, could have turned the publication itself into campaign literature.

23

JA000307-308; *see also Yablonski*, 305 F. Supp. 876, 877 (requiring union to give space to a candidate would impermissibly force the union to promote his candidacy).  For that reason, too, Noble's request was unreasonable.

## III.  NOBLE DID NOT STATE A CLAIM THAT THE *POSTAL RECORD* CONSTITUTED CAMPAIGN LITERATURE

Given the legal deficiencies of the Section 401(c) claim he asserted, Noble now argues that the district court should have allowed him to proceed on a Section 401(c) claim that he did not assert:  namely, that the *Postal Record* constituted campaign literature by NALC's incumbent officers and therefore that NALC was obligated to allow him "similar distribution," 29 U.S.C. §481(c), by publishing his campaign advertisements.  Noble Br. 33.  Noble argues that, because he was *pro se* in the district court, the court should have looked beyond his amended complaint, to other papers he filed, and concluded that he asserted such a "similar distribution" claim.

It was not error for the district court not to construe Noble's papers as asserting a "similar distribution" claim.  Noble nowhere in his papers mentions the "similar distribution" language of Section 401(c) nor does he assert that the *Postal Record* constituted campaign literature.  But even if the district court had somehow read a "similar distribution" claim into Noble's papers, it would not have been error to deny that he had a viable claim.  Nowhere in Noble's district court papers did he assert facts sufficient to support a claim that the *Postal Record* constitutes

24

campaign literature.  And examination of the *Postal Record* itself defeats any such claim.

Devoting ample space to incumbent officers does not make a union's publication into their campaign literature when the coverage of them "is addressed to their regular activities and duties as officers and not as candidates for re-election" and when the publication contains no "overt or express electioneering material."  *New Watch-Dog Comm. v. N.Y.C. Taxi Drivers Union, Local 3036*, 438 F.Supp. 1242, 1250-51 (S.D.N.Y. 1977).  A union publication only constitutes "campaign literature" when it contains "a consistent concentrated practice of undue and excessive coverage of incumbent officers, and denigration of dissidents." *Camarata*, 478 F.Supp. at 331.  For example, in *Hodgson*, there was a "literal saturation" of the union's publication with items "pointing up the accomplishments and great leadership potential" of the incumbent union president, items which "extolled his extraordinary leadership capabilities."  344 F.Supp. at 23.  In *Guzman*, a book published by the union constituted campaign literature when about half of its text was devoted to the incumbent's presidency, mentioning him in 51 of 59 pages of that section, picturing him in 49 photographs, portraying him in a "very favorable" light, and "belittling the opposition candidates."  151 F.3d at 88.

Even when liberally construed, Noble's papers nowhere allege that the *Postal Record* followed a "concentrated practice of undue and excessive coverage of incumbent offers, and denigration of dissidents." *Camarata*, 478 F. Supp. at 331. Noble's papers asserted that the *Postal Record* "prominently features the activities of the union's incumbent officers" JA 000024 (¶11); publishes their columns and photographs, JA000034-35; and makes numerous references to NALC's President, JA000068 (¶15). None of that is improper. For example, the activities of the President of the United States and other government leaders are constantly in the headlines, because their activities make news. Similarly, the activities of a union's leaders are newsworthy and of interest to the membership.

Nor would it cross the line into campaign literature if, as Noble asserted, the *Postal Record* praised the accomplishments of the union's officers. JA000035. A union's publication need not be "a paragon of objective journalism." *New Watch-Dog*, 438 F. Supp. at 1251. Coverage that is "uncritical" and even favorable will not alone convert the union's publication into campaign literature. *Id.*

Rather than just rely on Noble's description of the *Postal Record*, the Court can and should examine the magazine, a copy of which is in the record. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (in affirming dismissal of complaint, this Court considers documents referenced in the complaint and integral to plaintiff's claim). To the extent the actual contents of the magazine differ from

Noble's description of them, the Court need not, and should not, accept Noble's description as true.  *See id.* at 963 ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice"); *accord Rivera v. Rosenberg & Assocs., LLC*, 142 F. Supp.3d 149, 161 (D.D.C. 2015).

The June 2022 issue of the *Postal Record*, which appeared just a few months before NALC's 2022 national officer elections, contained a cover story about the union's "Stamp Out Hunger" food drive.  JA000116.  Other articles included a report on two new members of the USPS Board of Governors, JA000109; a feature on a letter carrier who began his own business selling hot sauce, JA000113; a feature about a letter carrier originally from Ukraine who made a return visit there, JA000108; an explanation of letter carrier "hold down" assignments, JA000111; and an article about things to do in Chicago during the union's convention there, JA000121.  The magazine also contained notice of a dinner for retiring officers, JA000127; reports on rank-and-file letter carriers who engaged in heroism on the job, JA000128; information on the Muscular Dystrophy Association, JA000143; a page of information for military veterans, JA000144; summaries of activities of state letter carrier associations, JA000145; an update about the union's retirement community, JA000146; reports from the union's local branches, JA000153-160; and tables listing federal retirement system annuity payments, JA000163-164.

A fraction of the magazine – ten out of sixty pages -- contained columns by NALC's national officers.  JA000106, JA000131-140.  These columns made no mention of the officers' candidacies nor did they denigrate Noble or other candidates.  The columns were focused on information of interest to or useful to members.  NALC's President devoted his column to the AFL-CIO convention, JA000106; the Executive Vice President explained a new process for evaluating letter carrier delivery routes, JA000131; the Secretary-Treasurer devoted her column to reminding local NALC branches about their IRS and DOL filing obligations, JA000131; the Assistant Secretary-Treasurer explained how to amend branch bylaws, JA000134; the Director of Retired Members wrote about retirement planning, JA000137; the Director of Life Insurance explained definitions used in life insurance, JA000138; and the Director of Health Benefits wrote about a wellness incentive program, JA000139.[7]

Examination of the *Postal Record* shows that NALC has no "consistent concentrated practice of undue and excessive coverage of incumbent officers, and denigration of dissidents."  *Camarata*, 478 F. Supp. at 331.  Accordingly, the

---

[7] The tone and content of the June 2022 issue was consistent with that of the magazine in general.  Monthly issues of the *Postal Record*, from 2010 to the present, appear on NALC's website, at https://nalc.org/news/the-postal-record.

district court did not err by not allowing Noble to proceed on a "similar distribution" claim that he never asserted.

## IV. THE DISTRICT COURT DID NOT ERR BY DISMISSING NOBLE'S CLAIM WITH PREJUDICE

Finally, Noble argues that the district court erred by not allowing him leave to further amend his amended complaint. Noble Br. 32. This argument fails since any further amendment would have been futile. *See Dosso v. Wilkinson*, No. 20-5217, 2021 WL 1044427 (D.C. Cir. Feb. 19, 2021) (district court did not err in denying *pro se* plaintiff leave to amend when amendment would have been futile). As explained above, Section 401(c) does not obligate a union to publish a candidate's campaign advertisements. Moreover, examination of the *Postal Record* shows that it did not constitute campaign literature by NALC's incumbent officers.

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the district court's

judgment.

/s/ *Peter D. DeChiara*
Peter D. DeChiara
Cohen, Weiss and Simon LLP
900 Third Avenue
New York, New York 10022
(212) 356-0216
pdechiara@cwsny.com

Attorneys for Defendants-Appellees National
Association of Letter Carriers, AFL-CIO and
NALC Branches 9 and 421

## ADDENDUM OF PERTINENT STATUTES

29 U.S.C. §481(c):

Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the page limitation requirement in Federal Rule of Appellate Procedure 32(a)(7)(A) in that, excluding those items excludable under Federal Rule of Appellate Procedure 32(f), the brief does not exceed 30 pages.  The brief also meets the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B).  Excluding portions excludable by Federal Rule of Appellate Procedure 32(f) and this Court's Rule 32(e)(1), the brief contains 6,158 words.

/s/ *Peter D. DeChiara*

Peter D. DeChiara

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 6, 2023, I caused a copy of the foregoing Brief of

Defendants-Appellees to be served via the Court's ECF system upon:

>Daniel F. Olejko
>BRAGALONE OLEJKO SAAD PC
>901 Main Street, Suite 3800
>Dallas, TX 75202

>*Attorneys for Plaintiff-Appellant David W. Noble, Jr.*

/s/ *Peter D. DeChiara*
Peter D. DeChiara